# ILLINOIS *v.* CITY OF MILWAUKEE, WISCONSIN, ET AL.

No. 49, Orig.  Argued February 29, 1972—Decided April 24, 1972

DOUGLAS, J., delivered the opinion for a unanimous Court.

*Fred F. Herzog* argued the cause for plaintiff. With him on the briefs was *William J. Scott,* Attorney General of Illinois.

*Harry G. Slater* argued the cause for defendants. With him on the brief for defendant City of Milwaukee were *John J. Fleming* and *Richard F. Maruszewski. Michael S. Fisher* and *Burton A. Scott* filed a brief for defendant City of Kenosha. *Jack Harvey, Edward A. Krenzke,* and *Louis J. Roshar* filed a brief for defendant City of Racine. *Mr. Fleming* and *Harvey G. Odenbrett* filed a brief for defendant Sewerage Commission of the City of Milwaukee. *Ewald L. Moerke, Jr.,* filed a brief for defendant Metropolitan Sewerage Commission of the County of Milwaukee.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a motion by Illinois to file a bill of complaint under our original jurisdiction against four cities of Wisconsin, the Sewerage Commission of the City of Milwaukee, and the Metropolitan Sewerage Commission of the County of Milwaukee. The cause of action alleged is pollution by the defendants of Lake Michigan, a body of interstate water. According to plaintiff, some 200 million gallons of raw or inadequately treated sewage and other waste materials are discharged daily into the lake in the Milwaukee area alone. Plaintiff alleges that it and its subdivisions prohibit and prevent such discharges, but that the defendants do not take such actions. Plaintiff asks that we abate this public nuisance.

## I

Article III, § 2, cl. 2, of the Constitution provides: "In all Cases . . . in which a State shall be Party, the supreme Court shall have original Jurisdiction." Congress has provided in 28 U. S. C. § 1251 that "(a) the Supreme Court shall have original and exclusive jurisdiction of: (1) All controversies between two or more States."

It has long been this Court's philosophy that "our original jurisdiction should be invoked sparingly." *Utah* v. *United States,* 394 U. S. 89, 95. We construe 28 U. S. C. § 1251 (a)(1), as we do Art. III, § 2, cl. 2, to honor our original jurisdiction but to make it obligatory only in appropriate cases. And the question of what is appropriate concerns, of course, the seriousness and dignity of the claim; yet beyond that it necessarily involves the availability of another forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had. We

incline to a sparing use of our original jurisdiction so that our increasing duties with the appellate docket will not suffer. *Washington* v. *General Motors Corp., post,* p. 109.

Illinois presses its request for leave to file saying that the agencies named as defendants are instrumentalities of Wisconsin and therefore that this is a suit against Wisconsin which could not be brought in any other forum.

Under our decisions there is no doubt that the actions of public entities might, under appropriate pleadings, be attributed to a State so as to warrant a joinder of the State as party defendant.

In *Missouri* v. *Illinois,* 180 U. S. 208, Missouri invoked our original jurisdiction by an action against the State of Illinois and the Sanitary District of the City of Chicago, seeking an injunction to restrain the discharge of raw sewage into the Mississippi River. On a demurrer to the motion for leave to file a bill of complaint, Illinois argued that the Sanitary District was the proper defendant and that Illinois should not have been made a party. That argument was rejected:

> "The contention . . . seems to be that, because the matters complained of in the bill proceed and will continue to proceed from the acts of the Sanitary District of Chicago, a corporation of the State of Illinois, it therefore follows that the State, as such, is not interested in the question, and is improperly made a party.
>
> "We are unable to see the force of this suggestion. The bill does not allege that the Sanitary District is acting without or in excess of lawful authority. The averment and the conceded facts are that the corporation is an agency of the State to do the very things which, according to the theory of the complainant's case, will result in the mischief to be ap-

prehended. It is state action and its results that are complained of—thus distinguishing this case from that of *Louisiana* v. *Texas* [176 U. S. 1], where the acts sought to be restrained were alleged to be those of officers or functionaries proceeding in a wrongful and malevolent misapplication of the quarantine laws of Texas. The Sanitary District of Chicago is not a private corporation, formed for purposes of private gain, but a public corporation, whose existence and operations are wholly within the control of the State.

"The object of the bill is to subject this public work to judicial supervision, upon the allegation that the method of its construction and maintenance will create a continuing nuisance, dangerous to the health of a neighboring State and its inhabitants. Surely, in such a case, the State of Illinois would have a right to appear and traverse the allegations of the bill, and, having such a right, might properly be made a party defendant." 180 U. S., at 242.

In *New York* v. *New Jersey,* 256 U. S. 296, the State of New York brought an original action against the State of New Jersey and the Passaic Valley Sewerage Commissioners, seeking an injunction against the discharge of sewage into Upper New York Bay. The question was whether the actions of the sewage agency could be attributed to New Jersey so as to make that State responsible for them. The Court said:

"Also, for the purpose of showing the responsibility of the State of New Jersey for the proposed action of the defendant, the Passaic Valley Sewerage Commissioners, the bill sets out, with much detail, the acts of the legislature of that State authorizing and directing such action on their part.

"Of this it is sufficient to say that the averments of the bill, quite undenied, show that the defendant sewerage commissioners constitute such a statutory, corporate agency of the State that their action, actual or intended, must be treated as that of the State itself, and we shall so regard it." 256 U. S., at 302.

The most recent case is *New Jersey* v. *New York*, 345 U. S. 369. The action was originally brought by the State of New Jersey against the City and State of New York for injunctive relief against the diversion of waters from Delaware River tributaries lying within New York State. Pennsylvania was subsequently allowed to intervene. The question presented by this decision was the right of the City of Philadelphia also to intervene in the proceedings as a party plaintiff. The issues raised were broad:

"All of the present parties to the litigation have formally opposed the motion to intervene on grounds (1) that the intervention would permit a suit against a state by a citizen of another state in contravention of the Eleventh Amendment; (2) that the Commonwealth of Pennsylvania has the exclusive right to represent the interest of Philadelphia as *parens patriae;* and (3) that intervention should be denied, in any event, as a matter of sound discretion." 345 U. S., at 372.

We denied the City of Philadelphia's motion to intervene, saying:

"The City of Philadelphia represents only a part of the citizens of Pennsylvania who reside in the watershed area of the Delaware River and its tributaries and depend upon those waters. If we undertook to evaluate all the separate interests within Pennsylvania, we could, in effect, be drawn into an

intramural dispute over the distribution of water within the Commonwealth. . . .

"Our original jurisdiction should not be thus expanded to the dimensions of ordinary class actions. An intervenor whose state is already a party should have the burden of showing some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state." 345 U. S., at 373.

We added:

"The presence of New York City in this litigation is urged as a reason for permitting Philadelphia to intervene. But the argument misconstrues New York City's position in the case. New York City was not admitted into this litigation as a matter of discretion at her request. She was forcibly joined as a defendant to the original action since she was the authorized agent for the execution of the sovereign policy which threatened injury to the citizens of New Jersey. Because of this position as a defendant, subordinate to the parent state as the primary defendant, New York City's position in the case raises no problems under the Eleventh Amendment." 345 U. S., at 374-375.

We conclude that while, under appropriate pleadings, Wisconsin could be joined as a defendant in the present controversy, it is not mandatory that it be made one.

It is well settled that for the purposes of diversity of citizenship, political subdivisions are citizens of their respective States.[1]  *Bullard* v. *City of Cisco,* 290 U. S. 179;

---

[1] It is equally well settled that a suit between a State and a citizen of another State is not a suit between citizens of different States for the purposes of diversity of citizenship jurisdiction. *Postal Telegraph Cable Co.* v. *Alabama,* 155 U. S. 482, 487.

*Cowles* v. *Mercer County,* 7 Wall. 118, 122. If a political subdivision is a citizen for diversity purposes, then it would make no jurisdictional difference whether it was the plaintiff or defendant in such an action. That being the case, a political subdivision in one State would be able to bring an action founded upon diversity jurisdiction against a political subdivision of another State.

We therefore conclude that the term "States" as used in 28 U. S. C. § 1251 (a)(1) should not be read to include their political subdivisions. That, of course, does not mean that political subdivisions of a State may not be sued under the head of our original jurisdiction, for 28 U. S. C. § 1251 provides that "(b) the Supreme Court shall have original but not exclusive jurisdiction of: (3) all actions or proceedings by a State against the citizens of another State . . . ."

If the named public entities of Wisconsin may, however, be sued by Illinois in a federal district court, our original jurisdiction is not mandatory.

It is to that aspect of the case that we now turn.

## II

Title 28 U. S. C. § 1331 (a) provides that "[t]he district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

The considerable interests involved in the purity of interstate waters would seem to put beyond question the jurisdictional amount provided in § 1331 (a). See *Glenwood Light & Water Co.* v. *Mutual Light, Heat & Power Co.,* 239 U. S. 121; *Mississippi & Missouri R. Co.* v. *Ward,* 2 Black 485, 492; *Ronzio* v. *Denver & R. G. W. R. Co.,* 116 F. 2d 604, 606; C. Wright, The Law of Federal Courts 117–119 (2d ed. 1970); Note, 73 Harv. L. Rev. 1369.

The question is whether pollution of interstate or navigable waters creates actions arising under the "laws" of the United States within the meaning of § 1331(a). We hold that it does; and we also hold that § 1331 (a) includes suits brought by a State.

MR. JUSTICE BRENNAN, speaking for the four members of this Court in *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 393 (dissenting and concurring), who reached the issue, concluded that "laws," within the meaning of § 1331 (a), embraced claims founded on federal common law:

> "The contention cannot be accepted that since petitioner's rights are judicially defined, they are not created by 'the laws . . . of the United States' within the meaning of § 1331 . . . . In another context, that of state law, this Court has recognized that the statutory word 'laws' includes court decisions. The converse situation is presented here in that federal courts have an extensive responsibility of fashioning rules of substantive law . . . . These rules are as fully 'laws' of the United States as if they had been enacted by Congress." (Citations omitted.)

Lower courts have reached the same conclusion. See, *e. g., Murphy* v. *Colonial Federal Savings & Loan Assn.*, 388 F. 2d 609, 611–612 (CA2 1967); *Stokes* v. *Adair*, 265 F. 2d 662 (CA4 1959); *Mater* v. *Holley*, 200 F. 2d 123 (CA5 1952); American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 180–182 (1969).

Judge Harvey M. Johnsen in *Texas* v. *Pankey*, 441 F. 2d 236, 240, stated the controlling principle:

> "As the field of federal common law has been given necessary expansion into matters of federal concern and relationship (where no applicable fed-

eral statute exists, as there does not here), the ecological rights of a State in the improper impairment of them from sources outside the State's own territory, now would and should, we think, be held to be a matter having basis and standard in federal common law and so directly constituting a question arising under the laws of the United States."

Chief Judge Lumbard, speaking for the panel in *Ivy Broadcasting Co.* v. *American Tel. & Tel. Co.*, 391 F. 2d 486, 492, expressed the same view as follows:

"We believe that a cause of action similarly 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law . . . . The word 'laws' in § 1331 should be construed to include laws created by federal judicial decisions as well as by congressional legislation. The rationale of the 1875 grant of federal question jurisdiction—to insure the availability of a forum designed to minimize the danger of hostility toward, and specially suited to the vindication of, federally created rights—is as applicable to judicially created rights as to rights created by statute." (Citations omitted.)

We see no reason not to give "laws" its natural meaning, see *Romero* v. *International Terminal Operating Co.*, *supra*, at 393 n. 5 (BRENNAN, J., dissenting and concurring), and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.

As respects the power of a State to bring an action under § 1331 (a), *Ames* v. *Kansas*, 111 U. S. 449, 470–472, is controlling. There Kansas had sued a number of corporations in its own courts and, since federal rights were involved, the defendants had the cases removed to the federal court. Kansas resisted, saying that the federal court lacked jurisdiction because of Art. III,

§ 2, cl. 2, of the Constitution, which gives this Court "original Jurisdiction" in "all Cases . . . in which a State shall be Party." The Court held that where a State is suing parties who are not other States, the original jurisdiction of this Court is not exclusive (*id.*, at 470) and that those suits "may now be brought in or removed to the Circuit Courts [now the District Courts] without regard to the character of the parties." [2] *Ibid.* We adhere to that ruling.

### III

Congress has enacted numerous laws touching interstate waters. In 1899 it established some surveillance by the Army Corps of Engineers over industrial pollution, not including sewage, Rivers and Harbors Act of March 3, 1899, 30 Stat. 1121, a grant of power which we construed in *United States* v. *Republic Steel Corp.*, 362 U. S. 482, and in *United States* v. *Standard Oil Co.*, 384 U. S. 224.

The 1899 Act has been reinforced and broadened by a complex of laws recently enacted. The Federal Water Pollution Control Act, 62 Stat. 1155, as amended, 33 U. S. C. § 1151, tightens control over discharges into navigable waters so as not to lower applicable water quality standards. By the National Environmental Policy Act of 1969, 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, Congress "authorizes and directs" that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act" and that "all agencies of the Federal Government shall . . . identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values

---

[2] See also H. R. Rep. No. 308, 80th Cong., 1st Sess., A 104 (1947): "The original jurisdiction conferred on the Supreme Court by Article 3, section 2, of the Constitution is not exclusive by virtue of that provision alone. Congress may provide for or deny exclusiveness."

may be given appropriate consideration in decisionmaking along with economic and technical considerations." Sec. 102, 42 U. S. C. § 4332. Congress has evinced increasing concern with the quality of the aquatic environment as it affects the conservation and safeguarding of fish and wildlife resources. See, *e. g.*, Fish and Wildlife Act of 1956, 70 Stat. 1119, 16 U. S. C. § 742a; the Act of Sept. 22, 1959, 73 Stat. 642, authorizing research in migratory marine game fish, 16 U. S. C. § 760e; and the Fish and Wildlife Coordination Act, 48 Stat. 401, as amended, 16 U. S. C. § 661.

Buttressed by these new and expanding policies, the Corps of Engineers has issued new Rules and Regulations governing permits for discharges or deposits into navigable waters. 36 Fed. Reg. 6564 *et seq.*

The Federal Water Pollution Control Act in § 1 (b) declares that it is federal policy "to recognize, preserve, and protect the primary responsibilities and rights of the States in preventing and controlling water pollution." But the Act makes clear that it is federal, not state, law that in the end controls the pollution of interstate or navigable waters.[3] While the States are given time to establish water quality standards, § 10 (c)(1), if a State fails to do so the federal administrator[4] promulgates one. § 10 (c)(2). Section 10 (a) makes pollution of interstate or navigable waters subject "to abatement" when it "endangers the health or welfare of any persons."

---

[3] The contrary indication in *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493, 498 n. 3, was based on the preoccupation of that litigation with public nuisance under Ohio law, not the federal common law which we now hold is ample basis for federal jurisdiction under 28 U. S. C. § 1331 (a).

[4] The powers granted the Secretary of the Interior under the Federal Water Quality Act of 1965, 79 Stat. 903, were assigned by the President to the Administrator of the Environmental Protection Agency pursuant to Reorganization Plan No. 3 of 1970. See 35 Fed. Reg. 15623.

The abatement that is authorized follows a long-drawn-out procedure unnecessary to relate here. It uses the conference procedure, hoping for amicable settlements. But if none is reached, the federal administrator may request the Attorney General to bring suit on behalf of the United States for abatement of the pollution. § 10 (g).

The remedy sought by Illinois is not within the precise scope of remedies prescribed by Congress. Yet the remedies which Congress provides are not necessarily the only federal remedies available. "It is not uncommon for federal courts to fashion federal law where federal rights are concerned." *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 457. When we deal with air and water in their ambient or interstate aspects, there is a federal common law,[5] as *Texas* v. *Pankey,* 441 F. 2d 236, recently held.

---

[5] While the various federal environmental protection statutes will not necessarily mark the outer bounds of the federal common law, they may provide useful guidelines in fashioning such rules of decision. What we said in another connection in *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 456–457, is relevent here:

"The question then is, what is the substantive law to be applied in suits under § 301 (a) ? We conclude that the substantive law to apply in suits under § 301 (a) is federal law, which the courts must fashion from the policy of our national labor laws. The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of the federal law will govern, not state law. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." (Citations omitted.) See also Woods & Reed, The Supreme Court and Interstate Environmental Quality: Some Notes on the *Wyandotte* Case, 12 Ariz. L. Rev. 691, 713–714; Note, 56 Va. L. Rev. 458.

The application of federal common law to abate a public nuisance in interstate or navigable waters is not inconsistent with the Water Pollution Control Act. Congress provided in § 10 (b) of that Act that, save as a court may decree otherwise in an enforcement action, "[s]tate and interstate action to abate pollution of interstate or navigable waters shall be encouraged and shall not . . . be displaced by Federal enforcement action."

The leading air case is *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, where Georgia filed an original suit in this Court against a Tennessee company whose noxious gases were causing a wholesale destruction of forests, orchards, and crops in Georgia. The Court said:

> "The caution with which demands of this sort, on the part of a State, for relief from injuries analogous to torts, must be examined, is dwelt upon in *Missouri* v. *Illinois,* 200 U. S. 496, 520, 521. But it is plain that some such demands must be recognized, if the grounds alleged are proved. When the States by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests; and the alternative to force is a suit in this court. *Missouri* v. *Illinois,* 180 U. S. 208, 241." 206 U. S., at 237.

The nature of the nuisance was described as follows:

> "It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted on a great scale by sulphurous acid gas, that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened by the act of persons beyond its control, that

the crops and orchards on its hills should not be endangered from the same source. If any such demand is to be enforced this must be, notwithstanding the hesitation that we might feel if the suit were between private parties, and the doubt whether for the injuries which they might be suffering to their property they should not be left to an action at law." *Id.,* at 238.

Our decisions concerning interstate waters contain the same theme. Rights in interstate streams, like questions of boundaries, "have been recognized as presenting federal questions." [6] *Hinderlider* v. *La Plata Co.,* 304 U. S. 92, 110. The question of apportionment of interstate waters is a question of "federal common law" upon which state statutes or decisions are not conclusive.[7] *Ibid.*

In speaking of the problem of apportioning the waters of an interstate stream, the Court said in *Kansas* v. *Colorado,* 206 U. S. 46, 98, that "through these successive disputes and decisions this court is practically building up what may not improperly be called interstate com-

---

[6] Thus, it is not only the character of the parties that requires us to apply federal law. See *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237; cf. *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265, 289; The Federalist No. 80 (A. Hamilton). As Mr. Justice Harlan indicated for the Court in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 421–427, where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law. See also *Clearfield Trust Co.* v. *United States,* 318 U. S. 363; *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447; C. Wright, The Law of Federal Courts 249 (2d ed. 1970); Woods & Reed, *supra,* n. 5, at 703–713; Note, 50 Texas L. Rev. 183. Certainly these same demands for applying federal law are present in the pollution of a body of water such as Lake Michigan bounded, as it is, by four States.

[7] Those who maintain that state law governs overlook the fact that the *Hinderlider* case was written by Mr. Justice Brandeis who also wrote for the Court in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, the two cases being decided the same day.

mon law." And see *Texas* v. *New Jersey*, 379 U. S. 674 (escheat of intangible personal property), *Texas* v. *Florida*, 306 U. S. 398, 405 (suit by bill in the nature of interpleader to determine the true domicile of a decedent as the basis of death taxes).

Equitable apportionment of the waters of an interstate stream has often been made under the head of our original jurisdiction. *Nebraska* v. *Wyoming*, 325 U. S. 589; *Kansas* v. *Colorado, supra;* cf. *Arizona* v. *California*, 373 U. S. 546, 562. The applicable federal common law depends on the facts peculiar to the particular case.

> "Priority of appropriation is the guiding principle. But physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former—these are all relevant factors. They are merely an illustrative, not an exhaustive catalogue. They indicate the nature of the problem of apportionment and the delicate adjustment of interests which must be made." 325 U. S., at 618.

When it comes to water pollution this Court has spoken in terms of "a public nuisance," [8] *New York* v. *New Jer-*

---

[8] In *North Dakota* v. *Minnesota*, 263 U. S. 365, 374, the Court said:

"[W]here one State, by a change in its method of draining water from lands within its border, increases the flow into an interstate stream, so that its natural capacity is greatly exceeded and the water is thrown upon the farms of another State, the latter State has such an interest as quasi-sovereign in the comfort, health and prosperity of its farm owners that resort may be had to this Court for relief. It is the creation of a public nuisance of simple type for which a State may properly ask an injunction."

*sey,* 256 U. S., at 313; *New Jersey* v. *New York City,* 283 U. S. 473, 481, 482. In *Missouri* v. *Illinois,* 200 U. S. 496, 520–521, the Court said, "It may be imagined that a nuisance might be created by a State upon a navigable river like the Danube, which would amount to a *casus belli* for a State lower down, unless removed. If such a nuisance were created by a State upon the Mississippi the controversy would be resolved by the more peaceful means of a suit in this court."

It may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance. But until that comes to pass, federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution. While federal law governs,[9] consideration of state standards may be relevant. Cf. *Connecticut* v. *Massachusetts,* 282 U. S. 660, 670; *Kansas* v. *Colorado,* 185 U. S. 125, 146–147. Thus, a State with high water-quality standards may well ask that its strict standards be honored and that it not be compelled to lower itself to the more degrading standards of a neighbor. There are no fixed rules that govern; these

---

[9] "Federal common law and not the varying common law of the individual States is, we think, entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain. The more would this seem to be imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them. In the outside sources of such impairment, more conflicting disputes, increasing assertions and proliferating contentions would seem to be inevitable. Until the field has been made the subject of comprehensive legislation or authorized administrative standards, only a federal common law basis can provide an adequate means for dealing with such claims as alleged federal rights. And the logic and practicality of regarding such claims as being entitled to be asserted within the federal-question jurisdiction of § 1331 (a) would seem to be self-evident." *Texas* v. *Pankey,* 441 F. 2d 236, 241–242.

will be equity suits in which the informed judgment of the chancellor will largely govern.

We deny, without prejudice, the motion for leave to file. While this original suit normally might be the appropriate vehicle for resolving this controversy, we exercise our discretion to remit the parties to an appropriate district court [10] whose powers are adequate to resolve the issues.

*So ordered.*

---

[10] The rule of decision being federal, the "action . . . may be brought only in the judicial district where all defendants reside, or in which the claim arose," 28 U. S. C. § 1391 (b), thereby giving flexibility to the choice of venue. See also 28 U. S. C. § 1407.

Whatever may be a municipality's sovereign immunity in actions for damages, see Van Alstyne, Governmental Tort Liability: A Decade of Change, 1966 U. Ill. L. F. 919, 944–948; Note, 4 Suffolk L. Rev. 832 (1970), actions seeking injunctive relief stand on a different footing. The cases are virtually unanimous in holding that municipalities are subject to injunctions to abate nuisances. See cases collected in 17 E. McQuillin, The Law of Municipal Corporations § 49.51 *et seq.* (3d rev. ed. 1968). See also Wis. Stat. Ann. § 59.96 (6)(b) (1957) as respects the suability of metropolitan sewerage commissions.

While the kind of equitable relief to be accorded lies in the discretion of the chancellor (*Harrisonville* v. *Dickey Clay Mfg. Co.,* 289 U. S. 334), a State that causes a public nuisance is suable in this Court and any of its public entities is suable in a federal district court having jurisdiction:

"[I]t is generally held that a municipality, like a private individual, may be enjoined from maintaining a nuisance. Thus in a proper case a municipal corporation will be restrained by injunction from creating a nuisance on private property, as by the discharge of sewage or poisonous gases thereon, or, in some jurisdictions, by the obstruction of drainage of waters, or by discharging sewage or filth into a stream and polluting the water to the damage of lower riparian owners, or by dumping garbage or refuse, or by other acts. Likewise, a municipality may be enjoined from creating or operating a nuisance, whether the municipality is acting in a governmental or proprietary capacity, impairing property rights. And, if a nuisance is established causing irreparable injury for which there is no adequate remedy at law it may be enjoined irrespective of the resulting damage or injury to the municipality." 17 McQuillin, *supra,* § 49.55.