**Harmel OUELLETTE and Lila Ouellette, Clifton Browne and Edla Browne, Aldee Plouffe and Shirley Plouffe, individually, on behalf of themselves, and on behalf of all similarly situated plaintiffs,**

**and**

**H. Vaughn Griffin, Sr., Ardath Griffin, Alan Thorndike, Ellen Thorndike, Wesley C. Larrabee, Virginia Larrabee, F. Alfred Patterson, Jr., and Lois T. Patterson, Plaintiff-Intervenors,**

**v.**

**INTERNATIONAL PAPER COMPANY.**

Civ. A. No. 78–163.

United States District Court, D. Vermont.

Feb. 5, 1985.

Peter Langrock, and Atty. Susan Eaton, Langrock, Sperry, Parker & Wool, Middlebury, Vt., for plaintiffs.

John Chase, Asst. Atty. Gen., State of Ver., Montpelier, Vt., for plaintiff Class Member, State of Vermont.

James Benkard, and Atty. Jamie Stern, Davis, Polk & Wardwell, New York City, and Austin Hart, Dinse, Erdmann & Clapp, Burlington, Vt., for defendant, International Paper Co.

COFFRIN, Chief Judge.

Having dealt with the defendant's objection to class certification in two previous opinions,[1] we are now presented with defendant's motion to dismiss plaintiffs' cause of action concerning water pollution pursuant to Rules 12(c) and 56(b) of the Federal Rules of Civil Procedure. Although defendant's motion was filed on June 22, 1981, the parties agreed (upon suggestion by the court) to await the Seventh Circuit's decision in the litigation brought by the State of Illinois and an Illinois resident against cities in Wisconsin and Indiana for pollution of Lake Michigan. That decision has now been rendered, *Illinois v. City of Milwaukee*, 731 F.2d 403 (7th Cir.1984) (hereafter, *"Milwaukee 7th Cir."*), cert. denied sub nom. Scott v. City

---

1. *Ouellette v. International Paper Co.*, 86 F.R.D. 476 (D.Vt.1980); *Ouellette v. International Paper* Co., No. 78–163 (D.Vt. Oct. 29, 1982).

of Hammond, —— U.S. ——, 105 S.Ct. 979, 83 L.Ed.2d 981 (1985), and, as anticipated, has illuminated many of the important issues raised by defendant's motion. Nevertheless, we depart somewhat from the conclusions drawn by the Seventh Circuit and, for the reasons below, deny defendant's motion to dismiss.

### Background

As certified in our opinion of October 29, 1982, plaintiff class consists of the State of Vermont as well as of various Vermont residents owning property in Vermont on or near the "South Lake" area of Lake Champlain. Defendant, a New York corporation, operates a paper mill near Ticonderoga, New York, on the shore roughly opposite plaintiffs' property. In their complaint, plaintiffs allege two "Causes of Action" within which they incorporate numerous counts. The "First Cause of Action," which defendant now seeks to dismiss, contains plaintiffs' various claims and theories related to the alleged pollution of Lake Champlain by defendant's Ticonderoga paper mill. The "Second Cause of Action," which relates to plaintiffs' claims for air pollution, is not at issue here.

Plaintiffs claim that discharges from defendant's paper mill have fouled the waters around plaintiffs' properties—which are used primarily for residential purposes but also for farming and some businesses such as marinas—interfering with the use and enjoyment of the property and, consequently, diminishing its value. Count I alleges that discharges from defendant's mill into the waters of Lake Champlain constitute "a continuing nuisance;" Count II alleges that defendant has violated its National Pollutant Discharge Elimination System (NPDES) permit by discharging pollutants into Lake Champlain in excess of the amounts specified in the permit; Count III alleges that defendant's discharges constitute an unreasonable riparian use; and Count IV alleges that defendant's discharges were negligent. Plaintiffs seek money damages and an injunction ordering de-

fendant to relocate its water intake system closer to the source of its waste discharge system.

Defendant responds (1) that its Ticonderoga paper mill has been operating pursuant to and in compliance with an NPDES permit, (2) that federal rather than state law controls disputes involving interstate water pollution, and (3) that Congress, in passing the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. (FWPCA), occupied the field of water pollution abatement, thereby barring any claim brought under federal common law for interstate water pollution. Relying on Milwaukee 7th Cir., supra, defendant claims that if Congress intended to allow any state common law action for abatement of pollution of interstate waters, it also intended that such a suit must be brought in the courts and under the laws of the state in which the discharge occurred. Defendant alternatively asserts that plaintiffs' rights as riparian owners have been resolved in prior proceedings. Finally, defendant alleges that even if plaintiffs were entitled to bring a state common law action grounded in nuisance, plaintiffs' failure to allege an injury different in nature from that suffered by the public in general deprives them of a cause of action for nuisance.

### DISCUSSION

#### I. State Common Law and Interstate Water Pollution Disputes

#### A. Illinois v. City of Milwaukee

Because the issues in the case are similar to those which have arisen during the course of attempts by Illinois to control pollution of Lake Michigan emanating from various cities located outside of Illinois, we briefly recount the several opinions involved in the litigation reflecting these attempts.

In Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (Milwaukee I) Illinois sought leave to file a bill of complaint under the Supreme Court's original jurisdiction against various Wisconsin cities and sewerage au-

thorities. Illinois alleged that discharges of untreated sewage into Lake Michigan constituted a public nuisance. The Court, in denying Illinois leave to invoke its original jurisdiction, held that the federal common law of nuisance governed the dispute. *Id.* at 105, 92 S.Ct. at 1394 ("The question of apportionment of interstate waters is a question of 'federal common law' upon which state statutes or decisions are not conclusive.") Although the Court held that, at the time of its decision, federal common law provided the basis for resolution of interstate water pollution disputes, it also recognized that "new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance." *Id.* at 107, 92 S.Ct. at 1395.

Illinois promptly brought suit in the United States District Court for the Northern District of Illinois alleging, *inter alia,* that discharge of sewage into Lake Michigan by the Wisconsin cities created a public nuisance under both federal and Illinois common law and that it violated Illinois statutes. After a trial, the district court found for plaintiffs and granted injunctive relief mandating changes in defendant's sewage system. The Seventh Circuit affirmed but concluded that "it is federal common law and not State statutory or common law that controls in this case." *Illinois v. City of Milwaukee,* 599 F.2d 151, at 177 n. 53 (7th Cir.1979).

Upon granting Milwaukee's petition for *certiorari* from that decision, the Supreme Court concluded that, with the passage of the 1972 Amendments to the FWPCA, Congress had since occupied the field of water pollution control by establishing a comprehensive regulatory program supervised by an expert administrative agency. *City of Milwaukee v. Illinois,* 451 U.S. 304, 317, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981) (*Milwaukee II* ). In so doing, Congress had

supplanted any federal common law action for nuisance.[2]

On remand, Illinois again pressed its claim for injunctive relief, this time on the basis of Illinois law. In a similar action, Illinois and a resident of Illinois, a Mr. W. Scott, brought separate suits against the City of Hammond, Indiana, for pollution of Lake Michigan, alleging violations of Illinois statutory and common law. The suit was brought originally in Illinois state court but was later removed to the United States District Court for the Northern District of Illinois. Motion to remand the case to state court was denied. *Illinois v. Sanitary District of Hammond,* 498 F.Supp. 166 (N.D.Ill.1980).

After Illinois prevailed over Milwaukee at trial, and the district court in the suit against the City of Hammond denied a motion by defendants to dismiss Illinois' state law claims,[3] *Scott v. City of Hammond,* 519 F.Supp. 292, 298 (N.D.Ill.1981), the Seventh Circuit consolidated the two cases and considered the availability of a state law action seeking injunctive relief for the alleged creation of a public nuisance in interstate waters. Relying primarily on the Supreme Court's decision in *Milwaukee I,* the Seventh Circuit held that pollution of interstate waters is a "controversy of federal dimensions, implicating the conflicting rights of states and inappropriate for state law resolution." *Milwaukee,* 731 F.2d at 410. The only role for state law in such disputes, according to the Seventh Circuit, was that which was specifically authorized by the 1972 FWPCA, the governing federal law. Reviewing the FWPCA, the Seventh Circuit concluded that, despite the language of 33 U.S.C. § 1365(e) (the so-called "Saving Clause") and § 1370(2) (the "state authority" provision), Congress had provided no authority

---

**2.** Illinois had also applied for *certiorari,* asserting that the Seventh Circuit erred in disregarding claims made by Illinois under Illinois' statutory and common law. Yet the Supreme Court in *Milwaukee II* specifically declined to pass on this question since it was the subject of Illinois' petition and not Milwaukee's. *Milwaukee II,*

451 U.S. at 310 n. 4, 101 S.Ct. at 1789 n. 4. The Court subsequently denied Illinois' petition. 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981).

**3.** The district court certified its ruling for an interlocutory appeal under 28 U.S.C. § 1292(b).

for one state (State A) or its citizens to use its *own* common or statutory law as a means to halt pollution discharged from facilities located in another state (State B). The court, however, did express its belief that Congress had authorized suits by State A or its citizens *in the courts of and under the laws of State B.* Because Illinois had brought suit in its own courts and used its own law, the consolidated cases were remanded for dismissal. On January 21, 1985, the Supreme Court denied plaintiff's petition for a writ of *certiorari, Scott v. City of Hammond,* —— U.S. ——, 105 S.Ct. 979, 83 L.Ed.2d 981 (1985), thus terminating that litigation.

Understandably, defendant in this case urges that we adopt the analysis and conclusions of the Seventh Circuit. *Milwaukee* is an admirable attempt to deal with the difficult issues concerning the role of state law in controlling the pollution of interstate waters. It is clear that state law, in the absence of Congressional authorization, cannot control interstate water pollution controversies. *Milwaukee I* and *II* stand for the proposition that attempts by one state to halt discharge into interstate waters emanating from another state implicate uniquely federal concerns. When the issue is viewed as a problem of equitable apportionment—as it should be in the absence of a contrary expression by Congress—the competing and conflicting interests of states and their citizens for limited quantities of interstate water mandate resort to federal law. The issue presented by the instant case, therefore, is not whether Congressional legislation *preempted* state statutory and common law as it relates to interstate water pollution since, according to *Milwaukee I,* federal law has *always* governed such disputes. Rather, the controlling question is the extent to which Congress authorized, either expressly or implicitly, resort to state common law in a situation such as this.

We differ from the Seventh Circuit in our perception of the extent to which Congress authorized resort to state law in the FWPCA. The Act creates a comprehensive regulatory scheme, the goal of which is to eliminate the discharge of pollutants into navigable waters by 1985. 33 U.S.C. § 1251(a)(1). Despite extensive federal oversight, Congress' express policy was to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution...." 33 U.S.C. § 1251(b). Commensurate with this policy, the role played by the states within the Act's framework is an important one: states are expressly empowered to adopt or enforce any point source or water quality limitation or standards stricter than the minimum levels imposed by the Act, 33 U.S.C. §§ 1370(1), 1311(b)(1)(C), and to administer their own enforcement programs. 33 U.S.C. § 1319.

In addition to the powers afforded the states within the regulatory scheme imposed by the Act, Congress included a "saving clause" providing that "nothing in this chapter shall ... be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370. Furthermore, the "state authority" section of the Act, 33 U.S.C. § 1365(e), similarly states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief...." Plaintiffs contend that these two sections authorize the application of Vermont common law to remedy an injury caused by discharges of pollutants emanating from defendant's paper mill in New York. We agree.

There are, perhaps, three ways to interpret the saving clause and state authority provision of the Act in light of Supreme Court decisions. Note, *City of Milwaukee v. Illinois: The Demise of the Federal Common Law of Water Pollution,* 1982 Wis.L.Rev. 627, 664–71. The most restrictive interpretation would be that Congress intended to save state common law only as it applied to waters which are outside of the FWPCA's jurisdiction. Since as much

as ninety to one hundred percent of the nation's waters fall within the definition of "navigable waters" (to which the Act applies), *id.* at 666, this view of the Act would render state law practically meaningless. Furthermore, under this interpretation of the Act, a person injured by pollution in "navigable waters" would be unable to recover damages from the polluter since the Act does not provide a damage remedy for private actions. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13–18, 101 S.Ct. 2615, 2622–2625, 69 L.Ed.2d 435 (1981). It is simply inconceivable that Congress intended to deprive a party injured by water pollution of all compensation for that injury. Such a result would be antithetical to the ends of the Act. It would also implicitly contradict Congressional intent as expressed in the Senate Report accompanying 33 U.S.C. § 1365(e):

> It should be noted, however, that this section would specifically preserve any rights or remedies under any other law. *Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages.*

S.Rep. No. 92–414, 92d Cong., 2d Sess. 81, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3746–47 (emphasis added). That state law actions were preserved is clear; the question is the extent to which they were preserved.

A second possible interpretation of the saving clause and citizen suit provisions of the Act is that they preserve a state's nuisance law only as it applies to discharges emanating from within that state or its boundary waters. This is the position suggested in *Milwaukee.* Although we find this view more plausible than the first, more restrictive interpretation, there is simply nothing in the Act which suggests that Congress intended to impose such limitations on the use of state law. We therefore adopt the third possible interpretation—that the Act authorizes actions to redress injury caused by water pollution of interstate waters through the laws of the state in which the injury occurred. We now set forth our reasons for departing from *Milwaukee*'s adoption of the second interpretation.

The Seventh Circuit—having concluded that, under *Milwaukee I,* state law remedies were inappropriate for the resolution of disputes such as that between Illinois and Milwaukee—reasoned that the saving clause could not preserve traditional state remedies since there was no right or jurisdiction to be saved. *Milwaukee,* 731 F.2d at 413. The court held that "[I]n the light of the structure of FWPCA and the potential conflict and confusion, we think Congress intended no more than to save the right and jurisdiction of a state to regulate activity occurring within the confines of its boundary waters." *Id.* (footnote omitted).

Without any textual support in the Act, this conclusion appears to be *post hoc* speculation as to what Congress *would* have intended *had it known* at the time of the Act's creation that the Supreme Court, in *Milwaukee I,* would hold that federal common law preempted state common law. The legislative history reveals, however, that at the time the FWPCA was formulated, state law rather than federal common law was applicable to interstate pollution disputes. As the Supreme Court noted in *Milwaukee II:*

> It must be noted that the legislative activity resulting in the 1972 Amendments largely occurred prior to this Court's [1972] decision in *Illinois v. Milwaukee [Milwaukee I].* Drafting, filing of Committee Reports, and debate in both Houses took place prior to the decision. Only conference activity occurred after. It is difficult to argue that particular provisions were designed to preserve a federal common law remedy not yet recognized by this Court.
>
> ... During the legislative activity resulting in the 1972 Amendments, ... this Court's decision in *Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493 [91 S.Ct. 1005, 28 L.Ed.2d 256] (1971), indicated

that *state* common law would control a claim such as Illinois'. *Wyandotte,* like the present suit, was brought by a State to abate a pollution nuisance created by out of state defendants. The Court ruled that an "action such as this, if otherwise cognizable in federal district court, would have to be adjudicated under state law. *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938)." *Id.,* at 498–99 n. 3 [91 S.Ct. at 1009–10 n. 3]. The Court in [*Milwaukee I*] found it necessary to overrule this statement, see 406 U.S. at 102 n. 3 [92 S.Ct. at 1392 n. 3].

451 U.S. at 327 n. 19, 101 S.Ct. at 1797 n. 19.

The Court's opinion as to the applicability of state law, *Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493, 500, 91 S.Ct. 1005, 1010, 28 L.Ed.2d 256 (1971)—which involved a dispute among several states and Canada concerning pollution of Lake Erie— was simply an expression of traditional tort law and choice of law principles existing at that time. The Supreme Court had previously summarized those principles in *Young v. Masci,* 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158 (1933):

> A person who sets in motion in one state the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument. The cases are many in which a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it. Thus, liability is commonly imposed under such circumstances for homicide, for maintenance of a nuisance, for blasting operations, and for negligent manufacture.

*Id.* at 258–59, 53 S.Ct. at 601 (citations omitted).

Given the state of the law during the time of the FWPCA's framing, it is completely reasonable to assume that Congress believed that a plaintiff suffering in State A might sue under the laws of State A to recover for injuries sustained as the result of pollution emanating from State B. It thus seems inescapable that Congress, by passage of the FWPCA's saving clause and state authority provisions, intended to preserve just such an action. In basing its decision on an incompatibility of state and federal law not yet recognized by Congress at the time of FWPCA's creation, *Milwaukee* thus imposed artificial limitations on the right to bring a state common law nuisance action.

■ The Seventh Circuit's position also creates a choice-of-law rule that deviates, without legislative authorization, from well-settled choice of law principles. *Milwaukee* would, in settling disputes over interstate pollution, mandate that, where state law was sought to be applied, courts apply the law of the state from which the pollution emanates regardless of the states' choice-of-law principles. Yet the FWPCA provides no support for this deviation from the rule that, in a diversity case, a federal court must apply choice of law principles of the state in which the court sits. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).[4]

Another factor weighing against the adoption of the position espoused in *Milwaukee* is that the conclusions reached are logically inconsistent. The Seventh Circuit concluded that the saving clause contained in the FWPCA could not save Illinois' "right" to bring an action against Milwaukee under Illinois law since, according to *Milwaukee I,* there was no such right to be saved. *Milwaukee I,* however, did not distinguish between water pollution emanating from outside the forum state's boundary waters and that emanating from within. That decision simply held that state

---

4. *See also Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) ("A federal court is not free to engraft onto those state rules exceptions or modifica-

tions which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits.)

law was ill-suited to resolve any dispute between two states concerning the pollution of interstate waters. There is nothing in *Milwaukee I* to suggest that the Supreme Court would have approved a suit by Illinois in the courts of and pursuant to the laws of Wisconsin. Using the Seventh Circuit's own analysis, then, the FWPCA did not save Illinois' right to sue in Wisconsin's courts under Wisconsin law since there was no such right to be saved. The Seventh Circuit nevertheless suggested that Congress, by inclusion of the saving clause, must have meant to save state law as it applied to in state discharges.

This inherently contradictory conclusion was apparently an attempt by the court to reconcile the express language of the saving clause and accompanying legislative history with the problems which the court believed would result from the application of state law in interstate water pollution disputes. In the situation presented here, however, nothing in the application of traditional common law remedies for nuisance would, as a practical matter, interfere with the objectives of the Act. In fact, the opposite is true. Congress, in passing the Act, sought "to restore and maintain the natural chemical, physical, and biological integrity of the Nation's waters" by eliminating the discharge of pollutants into navigable waters. S.Rep. 92–414, 92d Cong., 2d Sess. 81, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3678. To this end, states' imposition of compensatory damage awards and other equitable relief for injuries caused by discharges into interstate waters merely *supplement* the standards and limitations imposed by the Act.

Defendant's implied position is that application of state law principles might interfere with defendant's "right" to discharge under its NPDES permit. Yet there is no indication that Congress ever intended that the NPDES permit confer an absolute right to discharge to the extent allowed by the permit. Since compliance with the Act

does not constitute a defense to a common law action for damages, *see* S.Rep. 92–414, *supra,* Congress must have recognized that some uncertainty would result to dischargers of pollutants. The goal of the FWPCA is not finality; rather, it is the elimination of the discharge of pollutants.

Finally, we disagree with the defendant's contention that application of state nuisance law in a situation such as this may lead to a "chaotic confrontation between sovereign states." Unlike *Milwaukee*, the dispute here is between private parties. There is little or no possibility that this litigation will escalate into a conflict between different state entities.[5]

Even disregarding the nature of the parties involved, the common law action involved here does not directly implicate the regulatory powers of the states in which the parties are located. Plaintiffs have not attempted to impose legislatively defined standards or limitations on defendant. Plaintiffs seek compensatory damages, the purpose of which, of course, is to compensate parties for injuries or for interference with the use and enjoyment of their property. Such damages may have an indirect regulatory effect, yet the discharger remains free to operate so long as it pays for the injury it causes. *Cf. Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, ——, 104 S.Ct. 615, 629, 78 L.Ed.2d 443 (1984) (Blackmun, J., dissenting) (alleged contamination from federally-licensed nuclear facility; compensatory damages awarded under state law complement the federal regulatory standards, and are an implicit part of the federal regulatory scheme). Although an injunction to abate a nuisance has a direct impact on the polluter, it is designed primarily to redress a plaintiff's particular injury. In this respect, any intrusion on the sovereignty of the polluter's state is purely incidental. A state's nuisance law develops not to regulate the activity of neighboring states but to protect the

---

**5.** Although the State of Vermont, as a riparian landowner, has been included in the plaintiff class, *see Ouellette v. International Paper Co.*, No. 78–163 (D.Vt. March 27, 1983), the State's actions are presumably controlled by the settlement agreements previously entered into with IPC. *See* Section II, *infra.*

health, welfare, and property rights of its own residents. The application of state law in this situation is no more intrusive on the sovereignty of foreign states than the application of one state's product liability law to a manufacturer located in another state. *See e.g. Watson v. Employers Liability Corp.*, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954), *Bowles v. Zimmer Mfg. Co.*, 277 F.2d 868, 872–77 (7th Cir.1960).

Congressional authorization of state law in a situation such as this does not necessarily contradict the rationale employed by *Milwaukee I.* There the Court—relying on case law applied to disputes over the apportionment of interstate waters—held that state law action was an inappropriate means to resolve interstate water pollution disputes. But the Court also implicitly assumed that the discharge of pollutants, like the appropriation of water for personal consumption or reclamation, was simply another competing use of a limited resource. Federal law was necessary to effect an equitable means of "dividing the pie," *see Milwaukee*. Since that opinion Congress, by the passage of the FWPCA, has expressly altered the assumptions on which *Milwaukee I* was based: although pollution is a competing use for interstate waters, it may no longer be considered a *legitimate* competing use. Thus it would appear that the Act has shifted the controlling issue from how to "divide the pie" to how best to eliminate the discharge of pollutants into the nation's waters. Consideration of the express language of the saving clause and state authority provision of the Act, the legislative history, and the stated objectives of the Act inevitably leads one to the conclusion that Congress intended to authorize resort to state nuisance law in situations such as the instant one.

## II. *State Disposition of Plaintiffs' Riparian Rights*

In 1970, the State of Vermont brought an action in the United States Supreme Court against the State of New York and IPC alleging, *inter alia*, that IPC's discharges into the air and water constituted a nuisance and a trespass. After the United States intervened, negotiations among the parties led to a consent decree which was ultimately rejected by the Supreme Court. *State of Vermont v. State of New York*, 417 U.S. 270, 94 S.Ct. 2248, 41 L.Ed.2d 61 (1974). The parties then stipulated to a settlement that included the filing of a Motion to Dismiss without Prejudice. The complaint was dismissed by the Court on October 29, 1974. 419 U.S. 955, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Although the settlement agreements were apparently filed with the Stipulated Motion to Dismiss, the terms of the settlement were never before the Court.

There are two Agreements of Settlement in this case: one between the State of Vermont and IPC, ("Two-Party Agreement"), the other between the State of Vermont, the State of New York, IPC and the United States ("Four-Party Agreement"). Both Agreements provide:

> This Agreement shall constitute a contract in settlement of No. 50, Original, but shall not constitute an adjudication or finding on any issue of fact or law, or evidence or admission by any party with respect to any such issue raised therein. In consideration of the mutual rights and obligations set forth, the following provisions are agreed to and accepted by the parties and shall be binding upon them respectively.

Both Agreements are thus purely contractual in nature. In exchange for certain concessions and money payments by IPC, the State of Vermont pledged, in both Agreements, not to

> seek to recover from any party to No. 50, Original damages for harm to the South Lake, its waters, shores, adjacent acres ... allegedly suffered on or prior to the entry of an order dismissing the amended complaint in No. 50, Original for which the State of Vermont could have sought recovery in No. 50, Original.

¶ III(A)(2) of the Two-Party Agreement (the Four-Party Agreement contains a similar provision at ¶ IV(A)(2)).

The State also agreed that, for a given time period, it would not support limitations more stringent than those contained in the Agreement. Yet the Agreements also contained the following clause:

> Nothing herein shall be construed as affecting any claims or rights of any citizens or residents of the State of Vermont that may exist against any party to No. 50, Original.

¶ IV(F) of the Two-Party Agreement (the Four-Party Agreement contains a similar provision, at ¶ VI(F)).

■ Defendant, relying on *Badgley v. City of New York*, 606 F.2d 358 (2d Cir. 1979), contends that the plaintiffs here are bound by the state's covenant not to sue contained in the Agreements. According to defendant, individual Vermont landowners were represented by the State of Vermont, and their riparian rights were fully adjudicated and settled under the terms of the Agreements. Plaintiffs' water pollution claim, defendant reasons, should therefore be dismissed. We disagree.

In *Badgley,* owners of riparian land situated in Pennsylvania claimed that diversion, impoundment and manipulation of the headwaters of the Delaware River by the City of New York had caused a diminution in the value of their lands. The City countered that its conduct was authorized by the Supreme Court's equitable apportionment of the Delaware River's waters. *See New Jersey v. New York,* 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954).

After a trial which resulted in a damage award for plaintiffs, the Second Circuit considered whether or not the district court had erred in holding that common law riparian rights in streams are not destroyed or altered when those streams have been apportioned by a Supreme Court decree involving the common law doctrine of equitable apportionment. The court concluded that Pennsylvania—as a party to a consent decree entered by the Supreme Court setting forth the rights of the riparian states

along the Delaware, *New Jersey v. New York, supra,* and as a signer of the Delaware River Basin Compact, Pub.L. No. 87–328, 75 Stat. 688 (1961), had represented the rights of all its citizens. The terms of the decree and the compact were thus held conclusive upon all Pennsylvania residents and bound their rights. *Badgley,* 606 F.2d at 364.

A review of the Two- and Four-Party Agreements in the instant case, however, show that the settlement contracts to which the State of Vermont was a party differ in two important ways from the decree and compact to which Pennsylvania was a party.

First, a significant factor in *Badgley* was that an award of damages to plaintiffs in that case might have "hobble[d] or possibly even destroy[ed] the effect of Supreme Court decrees of Congressionally approved interstate water compacts", *Id.* at 366. Here, however, although the settlement agreement resolved a dispute subject to the Supreme Court's original jurisdiction, the Two- and Four-Party Agreements had received neither Supreme Court nor Congressional approval. By their express terms, the Agreements purport to be a contractual resolution of the controversy involving only the signing parties.

Second, and perhaps more important, the Delaware River decree and compact established "a *comprehensive* scheme of river regulation, all-inclusive as to *all matters* concerning the manipulation of the law of the undiverted portion of the Delaware River." *Id.,* 606 F.2d at 368 (emphasis added). In contrast, it appears from the Agreements in this case that the State of Vermont did not agree to a comprehensive allocation of discharge rights in the South Lake area but only to forbear from bringing suit against IPC or from proposing stricter limitations or conditions so long as IPC adhered to the limitations and conditions set forth.[6] The "saving clause" in-

**6.** Moreover, the Agreements applied only as to harm suffered on or prior to October 29, 1974, the date of the Supreme Court's Order of Dismissal, reported at 419 U.S. 955, 95 S.Ct. 246, 42 L.Ed.2d 260. *See, e.g.,* ¶ III(A)(2) of the Two-Party Agreement, quoted *supra,* and ¶ IV(A)(2)

cluded in both Agreements confirms this construction of the Agreements. Unlike the "saving clause" at issue in *Badgley*,[7] the clause contained in the Two-Party Agreement *specifically preserves any claims and rights of Vermont citizens and residents* that may exist against any party ·to the Supreme Court proceeding. Only the most tortured construction of this clause would prevent Vermont residents from recovering for injuries sustained as a result of pollution emanating from IPC's mill.[8]

It seems clear that the State of Vermont bargained for a reduction of effluents in return for a limited covenant not to file suit itself—nothing more. The State of Vermont did not, therefore, dispose of plaintiffs' riparian rights in signing the Two- and Four-Party Agreements.

### III. *Public Nuisance*

■ Defendant contends that plaintiffs have not alleged that they suffered harm different in kind from that suffered by the public in general, a necessary element of a private action for public nuisance under both New York and Vermont common law. *Roy v. Farr*, 128 Vt. 30, 37, 258 A.2d 799, 803 (1969); *Gibbons v. Hoffman*, 203 Misc. 26, 115 N.Y.S.2d 632 (1952); Restatement (Second) of Torts § 821C at 94 (1979). Plaintiffs allege in their complaint, however, that the discharges from defendant's mill "interfere with Plaintiffs' use and enjoyment of their property and have decreased the market value and rental value of their property." Such an allegation is sufficient to state a private cause of action for a "nuisance" which might generally be classified as "public." *See Hazen v. Perkins*, 92 Vt. 414, 421–22, 105 A. 249 (1918) (where variations in lake depth caused by defendant's dam "accentuated" adverse effects ·upon plaintiffs' shore properties, injury was "special and distinct", though injury was not substantial); *see also W. Prosser, The Law of Torts* § 88, at 588 (4th ed. 1971); 58 Am.Jur.2d, *Nuisance* § 111, at 675 (1971) ("Interference with the enjoyment and value of a person's private property rights is a special injury [allowing] recovery from a public nuisance ...."); Restatement (Second) of Torts § 821C, comments d and e (1979) ("When the public nuisance causes ... physical harm to [plaintiff's] land ·..., the harm is normally different in kind from that suffered by other members of the public ....").

### CONCLUSION

We find that the FWPCA authorizes actions to redress injury caused by water pollution of interstate waters under the common law of the state in which the injury occurred; that the State of Vermont did not dispose of plaintiffs' riparian rights when it entered into settlement agreements with IPC and the State of New York; and that plaintiffs have set forth allegations of · harm sufficiently different in kind than that suffered by the general public to state a claim for nuisance. Accordingly, defendant's motion to dismiss is hereby DENIED.

---

of the Four-Party Agreement. Thus, even if we were to hold that the rights of private individuals within Vermont to bring this action extended no further than that of the state itself, we would still allow recovery for harm which occurred after that date.

7. The "saving clause" in the Delaware River Basin Compact addressed by the court in *Badgley* provided: "Nothing contained in this compact shall be construed as affecting or intending to affect or in any way to interfere with the law of the respective signatory position relating to riparian rights." *Id.*, 606 F.2d at 371. Not only is this not as specific as the clause in the instant case, but the court held that it was inconsistent with other clauses within the same compacts. *Id.*

8. Apparently a significant factor in *Badgley* was the court's conclusion that the rights of riparian owners were not independent of the rights of Pennsylvania, but were merely derivative therefrom and therefore subject to change by Pennsylvania law. *Badgley*, 606 F.2d at 365. This does not alter our holding, however, since the saving clause at issue here could be viewed as a retained right of *the state*—that is, the clause retains the state's right to have claims brought by its citizens and residents resolved by the courts. Viewed from either perspective, the clause clearly excepts claims brought by private citizens or residents from any bar of access to the courts.