A & S COUNCIL OIL COMPANY,
INC., et al., Plaintiffs,

v.

Patricia SAIKI, et al., Defendants.

Civ. A. No. 87–1969–OG.

United States District Court,
District of Columbia.

Aug. 6, 1992.

Julius E. Mensah, Indianapolis, Ind., for plaintiffs.

Marina Utgoff Braswell, John D. Bates, Asst. U.S. Attys., Jay B. Stephens, U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on defendants' motion to dismiss, or in the alternative, for summary judgment, and on plaintiffs' cross-motion for summary judgment. The case has been fully briefed and argued in open court.

This case involves the legality of an agreement entered into on December 5,

1979, between the Small Business Administration ("SBA") and the Defense Logistics Agency ("DLA"), a procurement arm of the Department of Defense, establishing a pricing mechanism for the delivery of petroleum products to various government installations under a minority set-aside program known as section 8(a) of the Small Business Act of 1953 ("the Act"), as amended, codified at 15 U.S.C. § 637(a). Plaintiffs are three small, minority-owned or otherwise disadvantaged businesses, engaged in trucking operations which provided fuel and other petroleum products to the government under subcontracts with the SBA.[1]

On the merits, there being no genuine issue as to any material fact, the Court has concluded for the reasons stated below that plaintiffs are entitled to judgment as a matter of law. An appropriate order granting plaintiffs relief accompanies this opinion.

### Factual Background

Each plaintiff formerly participated in a federal program designed to aid disadvantaged and small businesses in winning government contracts, known as the section 8(a) program. Plaintiffs brought this action in July of 1987, complaining that the Administrator of the SBA, and her Associate Administrator, acted illegally and beyond their statutory authority in negotiating and implementing an agreement known as the *Memorandum of Agreement/Domestic Post Camp and Station Ground Fuel Section 8(a) Contracting Procedure* ("Interagency Agreement" or "1979 Agree-

ment"), which is appended to this Memorandum.

Section 8(a) authorizes the Administrator of the SBA to negotiate contracts with various federal procuring agencies. These contracts provide for portions of various acquisitions to be "set-aside" or "reserved" for performance by firms that are certified under the section 8(a) program, firms which in turn subcontract with the SBA for performance. Acquisitions which are not made under the section 8(a) program are filled by competitive bidding.

The DLA is part of the Department of Defense, and it has an agency within its control called the Defense Fuel Supply Center ("DFSC"). The DFSC purchases ground fuels (petroleum and other petroleum products delivered by either tankwagon or transport) for military use and for the use of various federal agencies.

On December 5, 1979, William A. Clement, then Associate Administrator for Minority Small Business and Capital Ownership Development, United States Small Business Administration, signed the Interagency Agreement. It had previously been signed on November 28, 1979, by Charles T. Patterson, then Staff Director, Small and Disadvantaged Business Utilization, Defense Logistics Agency. The Interagency Agreement was applied between December 5, 1979 and July 17, 1985 by the DLA to all DFSC acquisitions of ground fuels from section 8(a) firms, including plaintiffs' six subcontracts[2] with SBA which quantify their injury and form the bases of their complaint.

---

**1.** Plaintiffs are A & S Council Oil Company, Inc., L.H. Smith Oil Corporation, and Williams Fuel Oil Service, Inc.

**2.** In their complaint, plaintiffs allege that they were awarded eight section 8(a) subcontracts which were governed by the 1979 Agreement; one for Council, five for Smith and two for Williams. Complaint ¶¶ 30–32. However, the identification numbers of the subcontracts were not all specified in the complaint. In the course of briefing this case, plaintiffs have accused defendants of not including *all* of their section 8(a) contracts governed by the 1979 Agreement in defendants' affidavits. Response to Defendants' Notice of Filing, filed September 21,

1991, at 3. For their part, defendants have indicated, from what their records show, that plaintiff Smith had only three section 8(a) subcontracts, and that its other contracts were won in competition with other bidders. Dec. of Darlene Terry Robinson, filed August 8, 1991, ¶ 7; Defendants' Supplemental Responses to Interrogatories Propounded by the Court ("Def.Supp.Resp."), filed March 13, 1992, at 2 n. 1. Plaintiff Williams may have performed more than two section 8(a) subcontracts. *Id.* Insofar as this discrepancy creates a genuine issue of material fact, the Court proceeds, interlocutory in character, to determine liability, leaving damages aside momentarily. Fed.R.Civ.P. 56(c).

The price per gallon that section 8(a) firms and plaintiffs were to receive under the Interagency Agreement was to be determined in relation to a Fair Market Price ("FMP") that was supplied by the DFSC to the SBA for each particular Commercial Market Area ("CMA"). The FMP was defined as the "highest award price for the competitively solicited items (by type of product and method of delivery) within each Commercial Market Area of the region." Interagency Agreement, Pt. III, § B. In addition, the DFSC determined the CMA with respect to existing commercial sources of supply who would be the suppliers if there were no section 8(a) contractors to choose from.

Once the DFSC provided SBA with the FMPs, SBA would then negotiate with the various section 8(a) firms qualified to work in a particular CMA to arrive at a price. In any event, the price was *not*, according to the Interagency Agreement, to be set higher than the FMP. Once the price was negotiated, there was no procedure by which it could be changed save the unlikely event of *mutual* agreement of both parties to the Interagency Agreement, the SBA and the DLA.

Plaintiffs were not included in the negotiations of the terms and conditions of the Interagency Agreement.

If, in the event no contracts in a CMA were awarded by competitive procedures for a product, the Interagency Agreement provided several formulae by which a price may be calculated by the DFSC. Interagency Agreement, Part III, § C. The documentation is not complete, but upon the best information and belief of the parties, this section of the Interagency Agreement was applied for only seventeen line items in two of plaintiff Smith's subcontracts. Def. Supp.Resp. at 5–6.

Once DFSC provided the FMPs, the SBA had 30 days to notify DFSC of the finally negotiated prices. Any prices up to the FMP were, by definition, fair and reasonable, and were to be accepted by DFSC.

There are at least six subcontracts with the SBA that plaintiffs complain about: one for plaintiff A & S Council, three for plaintiff Smith, and two for plaintiff Williams. All six subcontracts contained numerous "line items" which correspond to a particular delivery site with a specified quantity of fuel and a specified price. All three plaintiffs had subcontracts with the SBA whose FMPs were based on contracts with non-section 8(a) bidders who subsequently failed to perform on their contracts.[3]

### Procedural Background

The complaint was filed in July of 1987 in this Court with a prayer for declaratory relief and $15,000,000 in monetary damages. In March of 1988 the case was transferred, on defendants' motion, to the United States Claims Court for the reason that the district court lacked jurisdiction for claims in excess of $10,000 under the Tucker Act, 28 U.S.C. § 1346(a)(2) (1988). Originally, this Court thought "plaintiffs [were] clearly seeking money damages for loss of profits." Memorandum Opinion, filed March 2, 1988, at 14.

Upon transfer to the Claims Court, both parties argued that jurisdiction did not lie in that court. Plaintiffs maintained that the district court had jurisdiction to hear a monetary claim against the SBA, citing *Mar v. Kleppe*, 520 F.2d 867, 871 (10th Cir.1975). Defendants, on the other hand, argued that since plaintiffs had not submitted their claim to a contracting officer for a final decision under the Contracts Disputes Act ("CDA"), 41 U.S.C. § 605(a), a claim for declaratory relief could not lie because claims for declaratory relief cannot be heard in the Claims Court, due to its limited jurisdiction, unless there is a final decision (or deemed decision) of a contracting officer on a claim for money damages. *A & S Council Oil Co., Inc. v. United States*, 16 Cl.Ct. 743, 744–45 (1989).

---

**3.** Two line items in Council's contract DLA600–84–D–4045 were based on FMPs set by Mansfield Oil Company. Nine line items in Smith's contract DLA600–82–D–4994 were based on FMPs set by EMI Oil Company. Thirteen line items in Williams' contract DLA600–82–D–4820 were based on FMPs also set by EMI. Both EMI and Mansfield were terminated for default.

It did not escape notice that defendants had moved to transfer the case to the Claims Court only to then argue that it did not have jurisdiction. After consideration of all the arguments, the Claims Court decided that it did not have jurisdiction and, in the interest of justice, retransferred the case to this Court. *Id.* at 745, 750. Thereupon, the parties submitted dispositive motions which are before the Court at this time.

The complaint contains six counts. Count I contends that the Interagency Agreement is a rule within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(4), and is void as a matter of law for failure to comply with its notice and comment rules. Count II avers that the DLA failed to obtain the necessary approvals before entering into the Interagency Agreement, under the Defense Acquisition Regulation ("DAR"), 32 C.F.R. §§ 1–108 and 1–109, which was arbitrary and capricious. Count III declares that the Interagency Agreement violates DAR § 1–705.5(b)(2), which requires the FMP to be "predicated on the basis of likely costs under normal competitive conditions." Count IV states that plaintiffs were adversely affected by DLA's negotiation and implementation of the Interagency Agreement since it limited the authority of the contracting officer to make price adjustments to reflect consideration of unrealistically low contract prices as under DAR § 1–705.5(c)(1)(L)(ii). Count V avers that the SBA and its Administrator acted illegally in negotiating and implementing the Interagency Agreement since it allegedly violates the regulations and standard operating procedures ("SOP") implementing section 8(a). Finally, count VI declares that the Administrator acted in excess of her statutory authority by negotiating and implementing the Interagency Agreement since the Act does not authorize "agreements fixing prices to be paid by federal procuring agencies to subcontractors under the 8(a) program." Complaint ¶ 89.

Since the Claims Court was without jurisdiction to grant money damages under 41 U.S.C. § 605(a), it was also without jurisdiction to hear a claim for declaratory relief.

*United States v. King,* 395 U.S. 1, 5, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969). The Claims Court made it clear that plaintiffs do not seek damages that are the result of either contract performance or nonperformance. *A & S Council,* 16 Cl.Ct. at 748. Rather, plaintiffs contend that there was illegal conduct in entering into the Interagency Agreement with its pricing scheme, and that only after its execution and subsequent subcontracting were plaintiffs able to quantify the harm caused.

### Discussion

As a preliminary matter, the Court recognizes that plaintiffs have not pressed counts I, II, III or IV in their briefs since this case has been retransferred. Plaintiffs have elected not to prosecute count I invoking the Court's jurisdiction under the APA. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memo"), filed March 13, 1992, at 2. Furthermore, plaintiffs have elected to proceed only against the SBA, its Administrator, and her agents, but not against the defendants from the DLA, or the Department of Defense. Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Reply"), filed March 29, 1991, at 9.

Since counts II, III and IV were directed at the actions of the DLA, and count I was based on the APA, these four counts will be dismissed, with prejudice, for failure to prosecute.

## I. PROCEDURAL ISSUES

There are four threshold issues to be decided before the Court may reach the merits of this case. Defendants make several procedural arguments, including lack of subject matter jurisdiction, and failure to waive sovereign immunity. In addition, defendants claim that the 1979 Agreement is no longer in effect, and is in fact superseded by a 1985 agreement, thus rendering plaintiffs' claims moot, or in the alternative, denying plaintiffs' standing to sue since all subcontracts complained of were

governed by the terms of the 1979 Agreement.

Discussed in greater detail in part II below, on the merits, plaintiffs maintain that they relied on the purposes of the section 8(a) program and defendants' regulations, policies and the language of the Interagency Agreement to their detriment, and that defendants were unjustly enriched by entering into the Interagency Agreement. Defendants, on the other hand, deny that there was anything improper or illegal about the Interagency Agreement as written or applied and that any losses sustained by plaintiffs were solely as a result of their poor business judgment.

## A. *Waiver of Sovereign Immunity*

■ The United States, or agencies thereof, may not be sued without consent. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). "Waiver of sovereign immunity is a jurisdictional prerequisite much like, but not exactly the same as, subject matter jurisdiction; that is to say, unless sovereign immunity is waived, there can be no consideration of the subject matter." [4] *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

■ There are many statutes by which consent to suit has been given. As above, one of those waivers is found in the Small Business Act, 15 U.S.C. § 634(b)(1). Sovereign immunity is waived by the SBA outside the Tucker Act[5] by the "sue and be sued" clause of that statute. *See C.H. Sanders Co. v. BHAP Housing Dev. Fund Co.*, 903 F.2d 114, 119–20 (2d Cir.1990) (Title 20 U.S.C. § 1132g–1(c)(2) provided "sue and be sued" waiver of sovereign immunity against Dept. of Housing and Urban Development ("HUD") outside Tucker Act); *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 55 (2d Cir.1985) (Title 42 U.S.C. § 1456(c)(1) provided "sue and be sued" waiver against HUD). *See also ATC Petroleum v. Sanders*, 860 F.2d 1104, 1113 n. 2 (D.C.Cir.1988). However, such a waiver applies only to the agency involved, and not to the United States generally. *Falls Riverway Realty*, 754 F.2d at 55 (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co.*, 608 F.2d 28, 35–36 (2d Cir.1979)). The Court notes that it is only funds over which the Administrator of SBA has control to which sovereign immunity has been waived, not general Treasury funds. *Id.* at 36; *C.H. Sanders*, 903 F.2d at 120.

Defendants place much stock in a fairly recent decision in the Fourth Circuit, *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383 (4th

---

**4.** The close interaction of subject matter jurisdiction and sovereign immunity is clear from this opinion's not-altogether-successful attempt to separate these issues for purposes of clarity.

**5.** The Tucker Act, 28 U.S.C. §§ 1346, 1491, provides a grant of subject matter jurisdiction and a waiver of sovereign immunity for nontort claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." *Id.* § 1346(a)(2). If the claim is for less than $10,000, then the district courts may also hear such cases. *Id.* The question then becomes, is jurisdiction in the Claims Court exclusive for claims that exceed $10,000, irrespective of the language in 15 U.S.C. § 634(b)(1)? The specific usually trumps the general when interpreting statutes. Section 634 is more specific than the Tucker Act language in § 1346(a)(2). The Ninth Circuit said it best:

 In light of the plain language of section 634(b)(1), we agree that it would be a bizarre

result to preclude suits for over $10,000 against the SBA in federal district court when the same suit may be brought in any state court of general jurisdiction.
 Moreover, forcing small businesses throughout the nation to file claims against the SBA for more than $10,000 in the Court of Claims in Washington, D.C. is, without doubt, at odds with the consideration prompting the enactment of the Small Business Act.... *Munoz v. Small Business Admin.*, 644 F.2d 1361, 1364–65 (9th Cir.1981). *See United Penn Bank v. U.S.A. Small Business Admin.*, 603 F.Supp. 531, 532–33 (M.D.Pa.1984) (denied SBA's motion to dismiss or transfer to Claims Court in breach of contract case). *See also Expedient Services, Inc. v. Weaver*, 614 F.2d 56, 57 (5th Cir.1980). *But see Megapulse, Inc. v. Lewis*, 672 F.2d 959, 963 n. 13 (D.C.Cir.1982) (Claims Court has exclusive jurisdiction over nontort claims in excess of $10,000 against U.S.).
 A further discussion of the Tucker Act argument raised by defendants is on p. 1230 (note 9), and pp. 1230–31, *infra.*

Cir.1990). In that case two sub-subcontractors that had worked on some Navy offices in Virginia Beach, brought an action against the SBA and its Administrator claiming a breach of their statutory duty to determine that the subcontractor was capable of performing before making an award. Plaintiffs, in that case, sought imposition of an equitable lien against any contract balances, as well as money damages.

The court in *Driskill* held that the waiver of sovereign immunity in 15 U.S.C. § 634(b)(1) was specifically limited such that "courts have no jurisdiction to award injunctive relief against the SBA." *Id.* at 386 (citing *Duncan v. Furrow Auction Co.*, 564 F.2d 1107, 1109 (4th Cir.1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978)). The court was distinguishing the waiver of sovereign immunity by the "sue and be sued" clause in both the statute regulating the Postal Service, 39 U.S.C. § 401(1), which under *Kennedy Electric Co. v. United States Postal Service*, 367 F.Supp. 828 (D.Colo.1973), *aff'd on other grounds*, 508 F.2d 954 (10th Cir. 1974), allowed for the imposition of an equitable lien, and the Act, 15 U.S.C. § 634(b)(1), which specifically prohibits imposition of injunctive relief and "other similar process" against the SBA.[6]

■ Since the case at bar does not contemplate injunctive relief against defendants, it would seem that this *Driskill* precedent is limited on its facts, and therefore inapplicable. The "sue and be sued" clause in 15 U.S.C. § 634(b)(1) certainly waives sovereign immunity, but under *Driskill*,

not when injunctive relief is part of the case. When injunctive relief is not sought, as here, sovereign immunity is waived.

After *Mar v. Kleppe, supra*, the Tenth Circuit had occasion to revisit this area of the law in *Ascot Dinner Theatre, Ltd. v. Small Business Admin.*, 887 F.2d 1024 (10th Cir.1989). Defendants cite this latter case as dispositive of the case at bar having limited the holding in *Mar. Id.* at 1030 & n. 5. A careful examination of these two cases, along with the *Trans-Bay*[7] and *ATC Petroleum* decisions in this Circuit, and the *Driskill* decision in the Fourth Circuit, convinces the Court that there has been a waiver of sovereign immunity and a grant of jurisdiction to hear this case.

In *Ascot*, the trial court had awarded damages to the Ascot Dinner Theatre ("Theatre"), and against the SBA for having denied a loan guaranty to the Theatre; the Tenth Circuit reversed. The Theatre was to be located in a shopping center in Lakewood, Colorado. The Theatre signed a lease for the property in October 1982, paying $49,000 on deposit and agreeing to pay $1.1 million for tenant improvements by January of 1983. After no less than three extensions, the partnership which owned the center sent the Theatre a default letter. In the meantime, the Theatre, through its representative, had attempted to get financing. Application was made to the SBA for a loan guaranty. SBA denied the loan application for the sole reason that the Theatre qualified as an "opinion molder" and was therefore ineligible for a loan guaranty under 13 C.F.R. § 120.2(d)(4).[8]

---

6. The Fourth Circuit also agreed with the district court in *Driskill*, that in addition to there being no waiver of sovereign immunity for injunctive relief in § 634(b)(1), the district court could not award damages against the SBA since plaintiffs' theory of recovery sounded in tort and plaintiffs had failed to comply with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1976). *See Hicks & Ingle Co. v. Abdnor*, 703 F.Supp. 464, 466 (E.D.Va.1989), *aff'd sub nom., J.C. Driskill, Inc. v. Abdnor*, 901 F.2d at 386. The Court takes up this issue and this holding in *Driskill* below on pp. 1229–30, and note 9, *infra*.

7. *Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370 (D.C.Cir.1976). The *Trans-Bay* decision is discussed on pp. 1231–32, *infra*.

8. Applications for loan guaranties are prohibited

If the applicant is engaged in the creation, origination, expression, dissemination, propagation, or distribution of ideas, values, thoughts, opinions or similar intellectual property, regardless of medium, form or content. Financial assistance to such applicants is barred in order to avoid Government interference, or the appearance thereof, with the constitutionally protected freedoms of speech and press; ....

13 C.F.R. § 120.2(d)(4).

On appeal, in *Ascot*, three different arguments concerning sovereign immunity were advanced and rejected. The Theatre challenged the regulation known as the "opinion molder rule" on the ground that it was unconstitutionally applied. This claim was viewed and treated as a tort, and the FTCA was cited as the exclusive remedy for tort actions against a federal agency. *Ascot*, 887 F.2d at 1028 (citing 28 U.S.C. § 2679).

Next, the Theatre resisted classification of its claim as a tort and advanced a contract theory instead, the idea being that the SBA had made a commitment to guaranty the Theatre's loan and breached that agreement. The case of *Mar v. Kleppe, supra*, was cited for the proposition that a jurisdictional grant is included in 15 U.S.C. § 634(b) for a contract claim against the Administrator without precluding an action for damages or a declaratory judgment. *Ascot*, 887 F.2d at 1029. The Theatre's contract arguments were hampered by the facts. There was no such loan guaranty or commitment between the Theatre and the SBA, whereas in *Mar*, there was at least an oral agreement. The Theatre's reasonable expectation that the loan guaranty "program would be administered in accordance with the Constitution" was held to be insufficient. *Id.* at 1030. The court concluded that in the absence of a contract or oral agreement, the Theatre's claim was a tort and thus subject to the FTCA. *Id.* at 1031 (citing *Jackson v. United States*, 216 Ct.Cl. 25, 573 F.2d 1189, 1199 (1978); *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co.*, 592 F.2d 364, 368–69 (7th Cir.), cert. denied, 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979)).

The final argument the Theatre advanced, to no avail, was that its claim was based on the first amendment. The Tenth Circuit wrote: "However desirable a direct remedy against the government might be as a substitute for individual official liability, '... the sovereign still remains immune to suit.'" *Ascot*, 887 F.2d at 1031 (citing *Martinez v. Winner*, 771 F.2d 424, 442 (10th Cir.1985) (quoting *Bivens v. Six Unknown Unnamed Agents*, 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring))).

▬ The limitation that *Ascot* imposes on *Mar* is that 15 U.S.C. § 634(b) is not read as a broad waiver of sovereign immunity. *Ascot*, 887 F.2d at 1030. The theory of a claim against the SBA may not be totally devoid of a contractual basis. *Id.* at 1030 n. 5. As the plaintiffs at bar have injuries quantified by their contracts with the SBA, and complain about an agreement the SBA had with the DLA, it cannot be said that their claims are devoid of a contractual basis.

As a final point on this subject, the Court is not prepared to characterize plaintiffs claims purely as torts, constitutional or otherwise, as was the case in *Driskill*, 901 F.2d at 386. While it appears that the SBA and its Administrator have breached statutory and regulatory duties by their actions in this case, the Court is convinced that most of the SBA's responsibilities to plaintiffs grew out of the Interagency Agreement itself. Thus, the FTCA does not stand in plaintiffs' way with respect to a waiver of sovereign immunity.

## B. *Subject Matter Jurisdiction*

▬ For the Court to have jurisdiction in this case, there must be a grant of subject matter jurisdiction, as well as a valid waiver of sovereign immunity that is "unequivocally expressed." *United States v. King*, 395 U.S. at 4, 89 S.Ct. at 1503; *Testan*, 424 U.S. at 399, 96 S.Ct. at 954; *Falls Riverway Realty*, 754 F.2d at 54; *S.S. Silberblatt*, 608 F.2d at 35; *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co.*, 595 F.2d 1126, 1132 (9th Cir.1979). The Court rejects defendants' challenge to this Court's jurisdiction.

In the first instance, the Court must evaluate the cause of action to determine whether there is a grant of jurisdiction and a waiver of sovereign immunity. This present case is one that "arises under the Constitution, laws, or treaties of the United States" pursuant to 28 U.S.C. § 1331, most notably, 15 U.S.C. § 631 *et seq.*, and the Takings Clause of the fifth amendment to the Constitution.

Section 1331 is the natural choice, and plaintiffs' choice, for a grant of jurisdiction. Federal question jurisdiction

lies, without regard to the amount in controversy, in an action against the United States, or its agencies, or any of its officers or employees in their official capacity, arising under the Constitution, laws or treaties of the United States. Included within this grant is jurisdiction in the federal courts to review federal agency actions.

*Sharrock v. Harris,* 473 F.Supp. 1173, 1175 (S.D.N.Y.1979) (citing *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977)). The SBA is a federal agency, and this case is a review of its actions.

■■■■ In addition, the Court notes that while plaintiffs' causes of action are not based specifically on their contracts with the government, they do arise from contracts to which the government is a party.[9] Subject matter jurisdiction, then, exists under 28 U.S.C. § 1331 for just such causes of action. *Illinois v. Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

Also, contracts with the federal government are governed by federal common law. *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947).

■■■ Since plaintiffs challenge the conduct of the Administrator of the SBA in entering into and implementing the 1979 Agreement and establishing a pricing mechanism at odds with the purposes of the section 8(a) program, as well as with the regulations and procedures promulgated pursuant thereto, and since they claim money damages quantified by their subcontracts with the SBA, a grant of federal question jurisdiction is plain.

A recent Supreme Court decision also helps plaintiffs' search for a grant of jurisdiction. In *American National Red Cross v. S.G.,* —— U.S. ——, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992), the "sue and be sued" provision in the charter of the Red Cross, a federally chartered corporation, was read to confer jurisdiction in federal courts when specifically mentioned. *Id.* —— U.S. at ——, 112 S.Ct. at 2471. In the case at bar, the grant of jurisdiction comes from 15

**9.** Defendants argue that plaintiffs have not complied with the Contract Disputes Act, 41 U.S.C. § 605(a). Plaintiffs have admitted as much. This is why the Claims Court declined jurisdiction to hear this case. *A & S Council,* 16 Cl.Ct. at 748. Defendants ask the Court to pigeonhole plaintiffs' claims as "relating to a contract," as under the CDA, and to then dismiss their claims as being insufficient under that statute. The Claims Court rejected this argument by saying: "[P]laintiffs' claim is simply that they were injured by [the Interagency Agreement] long before the section 8(a) contracts were entered into, *i.e.,* at least by 30 months, and that the pleading of the section 8(a) contract is *not* a contractual jurisdictional averment...." *Id.* at 749.

Next, defendants have argued that the breach of a statutory duty is a tort and so this case properly belongs under the Federal Tort Claims Act. Breach of a statutory duty or one imposed by case law, and not by a contract, is a tort. *Driskill,* 901 F.2d at 386 (citing *FDIC v. Citizens Bank,* 592 F.2d at 369). Also, in *FDIC v. Citizens,* the Seventh Circuit found a claim that the FDIC had "acted wrongfully in exceeding its statutory authority," to be more properly analyzed as based on the alleged underlying tort, and proceeded to treat it as such. *Id.* at 369. Under the FTCA, FDIC was held to be immune

from tort claims since its "sue and be sued" authority did not permit suit outside the FTCA for torts excepted from its coverage. *Id.* at 371. There is no argument concerning the facts in the case at bar; plaintiffs have not complied with the procedural requirements of either the CDA or the FTCA.

Defendants would have the Court believe that the Tucker Act provides the only way to proceed for an individual seeking just compensation for a government taking. Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Opposition"), filed March 28, 1991, at 5 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984), and *Ascot Dinner Theatre,* 887 F.2d at 1028). As demonstrated earlier, the Tucker Act is not the exclusive rubric for adjudicating claims of takings in excess of $10,000. *See supra* note 5.

This case is best considered here, in federal court. Plaintiffs' claims are neither simply tort nor contract such that Congress intended they be considered and handled exclusively under the CDA or FTCA rubrics. The claims are constitutional in nature and relate to both contracts and actions of federal agents injurious to plaintiffs, beyond those agents' authority, causing unjust enrichment, and at odds with the purposes of section 8(a).

U.S.C. § 634(b)(1), which says that the Administrator of the SBA may

> sue and be sued in any court of record of a State having general jurisdiction, *or in any United States district court, and such jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy;* but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property.

*Id.* (emphasis supplied). Defendants place more emphasis on the last clause suggesting that the district court may not entertain plaintiffs' prayer for a declaratory judgment, one can assume, because a declaratory judgment would be a "similar process" to an injunction or attachment. However, there is ample authority to support a finding that 15 U.S.C. § 634(b)(1) makes an action for damages and declaratory relief proper. *Mar v. Kleppe,* 520 F.2d at 871; *Gilford v. United States,* 573 F.Supp. 96 (D.Colo.1983); *Claxton v. Small Business Admin.,* 525 F.Supp. 777 (S.D.Ga.1981); *Carter v. Small Business Admin.,* 40 Colo.App. 271, 573 P.2d 564 (1977), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 174 (1984). Furthermore, it is not entirely clear that the SBA has immunity from every type of injunction. *See Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052 (1st Cir.1987) (section 634(b)(1) does not bar all injunctions or judicial review of agency actions that exceed agency authority where such remedies would not interfere with internal operations of agency).

Defendants argue forcefully that the Tucker Act, 28 U.S.C. § 1346(a)(2), limits this Court's jurisdiction to hear contract claims against the United States to those claims which do not exceed $10,000. It is true that with an ordinary contract claim against the United States the most ready-made waiver of sovereign immunity and grant of jurisdiction are to be found in the Tucker Act. However, as the discussion on sovereign immunity above demonstrates, plaintiffs may look to another statute for a waiver of sovereign immunity, in this case

15 U.S.C. § 634(b)(1), and to that same authority, the Constitution, or federal common law for a grant of subject matter jurisdiction.

In a very similar case, procedurally speaking, to the one at bar, the Court of Appeals found a grant of subject matter jurisdiction in 28 U.S.C. § 1331(a). *Trans–Bay,* 551 F.2d at 377–78. In vacating the district court's decision granting summary judgment, the Court of Appeals criticized the trial court for viewing the case as a "mere suit on a contract." *Id.* at 377. In *Trans–Bay,* the Secretary of HUD was sued to recover monies that were held by HUD as a "holdback" during construction of a federal housing project. There was no contract obligation between HUD and the plaintiff Trans–Bay, as there is none between the SBA and the plaintiffs at bar. However, the language used by the Court of Appeals is illuminating, applicable and controlling:

> Here we are asked to determine whether the Secretary of HUD has an obligation to plaintiff Trans–Bay that is not rooted in a contract between them, but rather on *equitable rights* generated by HUD's course of activities pursuant to federal statutes, including the contracts it has sponsored, and prescribed for others, as a condition of federal aid. The claim of right is dependent on federal common law.

*Id.* (emphasis added) (citing *United States v. Chester Park Apts., Inc.,* 332 F.2d 1 (8th Cir.), *cert. denied,* 379 U.S. 901, 85 S.Ct. 191, 13 L.Ed.2d 176 (1964); *United States v. View Crest Garden Apts., Inc.,* 268 F.2d 380 (9th Cir.), *cert. denied,* 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959)). *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *United States v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970). *Contra C.H. Sanders,* 903 F.2d at 118; *Falls Riverway Realty,* 754 F.2d at 54 n. 3.

In previewing the merits of the case in *Trans–Bay* on its way to finding federal question jurisdiction, the Court of Appeals wrote:

Congress enacted § 236 of the National Housing Act to encourage participation of private capital in housing construction and rehabilitation. The success of this program clearly depends on the rights and obligations of the various parties, including the supervisor and guarantor, HUD. What governs their rights is not only the contracts they hold, but also the responsibilities of HUD, not limited to the contracts signed by HUD, but including responsibilities and duties generated by its activities in furtherance of the Housing Act, including the sponsorship and prescription of contracts signed by others.

*Trans–Bay,* 551 F.2d at 377 (citing *compare, Clearfield Trust,* 318 U.S. at 363, 63 S.Ct. at 573, *with Bank of America National Trust and Savings Ass'n v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956)).

The Seventh Circuit, in 1991, also held 15 U.S.C. § 634(b)(1) to be both a grant of specific federal question jurisdiction, and a waiver of sovereign immunity for contract actions claiming money damages in excess of $10,000 from the SBA. *General Ry. Signal Co. v. Corcoran,* 921 F.2d 700, 704–06 (7th Cir.1991).

The Second Circuit has declined to follow Judge Leventhal's "equitable rights" formulation in *Trans–Bay* as being too "vague." *Falls Riverway Realty,* 754 F.2d at 54 n. 3; *C.H. Sanders Co.,* 903 F.2d at 118. In *C.H. Sanders,* the court said that a " 'vague formulation' of equitable rights alone will not confer subject matter jurisdiction." *Id.* (quoting *Falls Riverway,* 754 F.2d at 54 n. 3). However, both the *C.H. Sanders* and *Falls Riverway Realty* courts went on to entertain subject matter jurisdiction because plaintiffs in those cases, "simply by alleging a cause of action, not patently frivolous on its face, that purportedly arises under a federal statute, ha[d] made allegations sufficient to sustain subject matter jurisdiction in the district court." *Id.*[10]

The case at bar is not frivolous and the cause of action arises under federal statutes, regulations, common law, agency procedures, and the Constitution. Quite simply, if federal common law needs to be applied, the case arises under the laws of the United States. *Id.; Illinois v. Milwaukee,* 406 U.S. at 100, 92 S.Ct. at 1391.

### C. *Standing*

Defendants argue that since the Interagency Agreement signed in 1979 has been replaced by another agreement entitled *Memorandum of Agreement, Defense Fuel Supply Center, Section 8(a) Contracting Procedures,* signed June 6, 1985 ("1985 Agreement"), and because plaintiffs have not had any contracts governed by the 1985 Agreement, plaintiffs do not have standing to seek a declaratory judgment with respect to the 1985 Agreement. Plaintiffs all but concede as much in their supplemental briefing on standing. Plaintiffs' Memorandum to the Court, filed August 23, 1991, at 2–3.

The question is not so much about the 1985 Agreement, but rather whether plaintiffs have standing to complain about the conduct of the Administrator in negotiating and implementing the 1979 Agreement and its pricing mechanism, even though it has been superseded by the 1985 Agreement and in spite of the fact that plaintiffs have had no contracts governed by the 1985 Agreement.

The Supreme Court has developed a fairly clear test for Article III standing: "(1) there must be concrete personal injury to the plaintiff, (2) such injury must be fairly traceable to the challenged conduct, and (3) the injury must be 'likely' to be redressed if the relief sought is granted." *Kurtz v. Baker,* 829 F.2d 1133, 1138 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1983), and *Valley*

---

**10.** The Second Circuit found, in *C.H. Sanders,* that the claim of unjust enrichment was plausible and sufficient to invoke federal question jurisdiction. *C.H. Sanders,* 903 F.2d at 118.

The plaintiffs in this case have claimed that the SBA and its Administrator have been unjustly enriched.

*Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

Since all three plaintiffs have suffered financial losses as a result of participation in the section 8(a) program, there are undoubtedly concrete personal injuries. The injuries allegedly stem directly from the conduct of the SBA Administrator in negotiating and implementing the 1979 Interagency Agreement, *and* in the pricing practices, responsibilities and procedures under that agreement which substantively remain intact under the 1985 Agreement.[11]

The final question, then, is whether the injury will be redressed if the relief sought is granted. The relief sought includes a declaratory judgment that the actions of the Administrator were illegal, money damages, costs, and attorney's fees. If the Administrator's actions which led to the 1979 Agreement are declared illegal, the 1985 Agreement and its pricing scheme will not be able to serve as a defense. True, plaintiffs could not then collect damages that would be traced to the 1985 Agreement, since there are none. However, plaintiffs have quantified their economic injuries, and money damages will redress those injuries. A declaratory judgment that the 1979 Agreement was illegal as written and applied will aid plaintiffs in their collection of damages against the SBA and its Administrator.

### D. *Mootness*

■ In an argument related to standing, defendants state, with respect to the 1979 Agreement, that it is no longer in effect, and therefore the issue is moot. Memorandum of Points and Authorities in Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defendants' Reply"), filed May 2, 1991, at 4–5. Plaintiffs argue that their injury is directly traceable to the actions of the Administrator in negotiating and implementing the 1979 Agreement and that they are presently harmed by those actions. While it is true that the 1979 Agreement is not in effect, plaintiffs' injury, however, can be traced to it, and the 1985 Agreement is similar in its pricing mechanism such that the Court could conclude that the harm is likely to recur. *See supra* note 11.

Declaratory actions must present a "case or controversy" within the meaning of the Constitution in all federal cases. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). There must be a "substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945). A moot question is nonjusticiable under the Constitution. *Aetna,* 300 U.S. at 240, 57 S.Ct. at 463–64.

■ Even though it is not in dispute that the 1979 Agreement is no longer in effect, adverse parties still exist with significant interests on either side of this litigation. They disagree about the legality of the actions of the SBA and its Administrator in the course of negotiating and implementing the 1979 Agreement. A question becomes moot when the significant interests on either side disappear. *See Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895) (because of intervening state constitutional convention, suit to challenge election of delegates to convention was mooted by its occurrence). *See also United States v. Simmons,* 714 F.2d 29

---

11. The relevant difference between the two agreements is that the 1979 Agreement defines the FMP as the "highest award price for the competitively solicited items." The 1985 Agreement requires the Contracting Officer at DFSC to "consider recent award prices for the same items or work if there is comparability in quantities, conditions, terms, and performance times." Furthermore, the 1985 Agreement requires that: "[t]erms and conditions which impact price shall be the same for the reserved items and the competitive item used to establish the FMP (*i.e.,* no special Economic Price Adjustment (EPA), payment terms, or other advantage that affects price)." While the language is not the same, nor the terms defined, in these two agreements, it seems to be a similar method of determining the FMP, as well as similar responsibilities of the SBA to decline low or marginal FMPs on behalf of the 8(a) contractors, or to question DFSC as to its price analyses, discrepancies, or use of faulty assumptions.

(5th Cir.1983) (action challenging arbitrary set-aside of contracts for award to minorities is not rendered moot by award of contract as it is capable of repetition).

The Court is convinced and concludes that since there is no substantive difference between the pricing mechanisms of the 1979 Agreement and the 1985 Agreement, the likelihood and possibility of repetition still exist for the actions which are at issue in this case, even if those actions do not presently govern the practice of fuel procurement between the SBA and DLA.

 Where, as here, equitable relief is involved, the analysis of such questions becomes more complex. If an injunction is sought for a specific action, the occurrence or performance of that act will usually moot the case. *Mills*, 159 U.S. at 653, 16 S.Ct. at 133. However, if the conduct of which plaintiff complains is capable of repetition, "a declaratory judgment may be rendered to define the rights and obligations of the parties." 6A Jas.Wm. Moore *et al.*, Moore's Federal Practice ¶ 57.13, at 57–129 (1991). The main concession the Supreme Court has made on this point is that a case may become moot "if subsequent events made it absolutely clear that the wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). But "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).

The Court is especially mindful of the fact that plaintiffs have not sought injunctive relief. Plaintiffs seek a declaratory judgment that the actions of the SBA and its Administrator were illegal. The principal conduct complained of was the articulation of a pricing scheme in the 1979 Agreement. For all intents and purposes, the 1985 Agreement embodies the same pricing mechanism as the 1979 Agreement. *See supra* note 11. The conduct of which plaintiffs complain is believed to be still in force and effect to this day. It would be folly for this Court to hold that a present or live controversy between these parties does not exist. The parties continue to disagree about both the legality of the 1979 Agreement, and the conduct of the SBA, and the determination of those questions certainly and presently affect both the rights and obligations of each party, not to mention the way the section 8(a) fuel procurement program is being administered and priced under the 1985 Agreement.

### E. *Conclusion*

The Court finds that the Takings Clause of the fifth amendment to the Constitution, 15 U.S.C. § 634(b)(1), 28 U.S.C. § 1331, and federal common law provide grants of federal question subject matter jurisdiction. Further, sovereign immunity is waived by the SBA and its Administrator by the "sue and be sued" clause in 15 U.S.C. § 634(b)(1). Since plaintiffs have demonstrated that they each have been injured in fact, that their injuries are directly traceable to defendants' actions, and that plaintiffs' injuries will be redressed by the relief they seek, the Court finds plaintiffs have standing to complain about the 1979 Agreement. Despite the fact that the 1979 Agreement has been superseded by the 1985 Agreement, the Court finds that a live controversy still exists about the legality of the 1979 Agreement as written and applied, and concerning its pricing mechanism which is substantially embodied in the 1985 Agreement, such that plaintiffs' claims are not moot. Defendants' actions are clearly capable of repetition. The Court also concludes that the Tucker Act is not the exclusive way for plaintiffs such as these who claim that the government has been unjustly enriched to seek just compensation. And finally, the Court finds that plaintiffs' claims sound neither precisely in tort nor contract so as to preclude jurisdiction in this Court for noncompliance with the CDA or FTCA. Accordingly, defendants' motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted will be denied.

## II. SUBSTANTIVE ISSUES

█ There are four basic injustices at work in this case. The first is that plaintiffs, firms participating in the section 8(a) program, a program designed to shelter them and aid them, did not receive the benefit of the program. Second, the formulaic and inflexible pricing mechanism in the 1979 Agreement tied noncompetitive section 8(a) prices to the prices arrived at by competitive bidding between non-section 8(a) firms without any provision for renegotiation of prices. This paved the way for unreasonably low bids by non-section 8(a) firms, firms which defaulted because they could not deliver at those prices. These low prices were used to establish the FMPs for plaintiffs' subcontracts, and were not subject to an increase when the FMP setters defaulted. Third, the SBA failed to shoulder its responsibility to evaluate the costs, profits and prices associated with each line item in each subcontract for each section 8(a) firm. It was SBA's responsibility to decline items for which 8(a) contractors could not make a fair and reasonable profit. For items at the margin of profitability, SBA had a responsibility to question the DFSC's price analysis or decline the item. And fourth, plaintiffs were not involved in the negotiations of the 1979 Agreement, in derogation of 15 U.S.C. § 637(a)(3)(A).

### A. *Benefit of the Section 8(a) Program*

Plaintiffs were all qualified minority contractors under section 8(a) of the Act. This authorizes the SBA "to arrange for the performance of ... procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns...." 15 U.S.C. § 637(a)(1)(C). The social and economic disadvantages that section 8(a) firms have experienced translate into a general inability to attract capital. Section 8(a) firms then, by definition, are not on the same financial ground as other firms. For example, the Act and other statutes contemplate that the SBA would provide substantial assistance to section 8(a) firms. *See, e.g.*, 15 U.S.C. § 637(b)(1)(A) (technical and managerial assistance); 41 U.S.C. § 255(a) (advance payments and interest-free loans).

Further, it is significant that the SBA's role in the 8(a) program is one of a mediator, a fiduciary of sorts, and a guarantor. Section 8(a) is different from other types of government procurement programs for the very reason that the firms which qualify are less able to weather the storms of competitive markets than those that have not been historically the subject of discrimination. With the SBA in the middle, section 8(a) firms have justifiably come to rely on the SBA to assist with the problems these firms face.

It is not for the Court to question the wisdom of the section 8(a) program. However, if Congress intended to help these small and disadvantaged firms by enacting section 8(a), then there must be some benefit to being in the program. There are many requirements that need to be met in order to be maintained as a qualified section 8(a) firm. *See* Plaintiffs' Memo, filed March 13, 1991, Ex. C, "Participation Agreement." Naturally, Congress intended that section 8(a) firms get more than just a reserved amount of work.[12] Congress clearly intended that the section 8(a) firms would earn a reasonable profit, and that they would benefit from being in the program. *Little v. United States*, 489 F.Supp. 1012, 1020 n. 9 (C.D.Ill.1980) (citing 1978 U.S.C.C.A.N. 3835, 3842–46, 3881–84).

At this point it is worth mentioning some of the regulations and standard operating procedures plaintiffs cite for the proposition that they did not get the benefit of the section 8(a) program. The SBA has adopted regulations in the past upon which plaintiffs relied, to wit:

(a) General. It is the policy of SBA to enter into contracts with other government agencies and subcontract perfor-

---

**12.** The Court notes that a reserved amount of work is not always assured for any one section 8(a) firm, since section 8(a) firms have their bids evaluated in a closed bid proceeding for various line items, and as against each other. How the SBA decides which section 8(a) firm will be awarded each line item is a matter of agency discretion without discrimination.

mance of such contract to concerns admitted to the section 8(a) program pursuant to section 8(a)(1)(c) of the Small Business Act, at prices which will enable a company to perform the contract and earn a reasonable profit.

13 C.F.R. § 124.8–2 (October 8, 1986), and (d) Negotiation of section 8(a) subcontracts. Section 8(a) subcontracts shall be awarded at prices which are fair and reasonable to the Government and to the subcontractor.

13 C.F.R. § 124.8–2 (May 25, 1973). The Standard Operating Procedures of the SBA are no less unequivocal:

a. Policy

The business development of an 8(a) concern is facilitated and enhanced by its successful performance of government contracts, particularly if it earns a reasonable profit. Accordingly it is the policy of SBA to enter into contracts with other government agencies and subcontract the entire performance of such contracts to eligible concerns, pursuant to section 8(a) of the Small Business Act, at prices which will enable them to perform and earn a reasonable profit.

S.O.P. 80.05, Chapter 8, ¶ 65 (effective September 4, 1979).

The Court is mindful that there has been substantial pressure on the SBA to wean section 8(a) firms from the program and graduate them to competitive status. The Court applauds these efforts. However, these efforts may not stray too far afield from the purposes of section 8(a). If plaintiffs are going to go to the trouble of maintaining their qualifications for the program, they have a right to its benefits.

In sum, plaintiffs entered into the section 8(a) program hoping to be benefitted by the experience. Plaintiffs had every expectation of being able to earn a fair and reasonable profit by their work. Not only did they not earn a profit as a result of these six subcontracts, they had capital reserves significantly depleted, and in one case, plaintiff Smith has had to file for protection in bankruptcy.

B. *Pricing Scheme of the Interagency Agreement*

Plaintiffs were further injured by having their subcontracts governed by a pricing mechanism which did not protect against non-section 8(a) firms submitting "low ball" (*i.e.*, unreasonably low) bids for line items, which permanently fixed plaintiffs' prices. When the non-section 8(a) firms could not deliver on their bid, while absorbing any penalty incurred, plaintiffs were told that their prices could not be adjusted. And so, when plaintiffs *were required* [13] to deliver at such low prices without any upward adjustment in price, they were injured.

Upon learning that the non-section 8(a) FMP-setters were going to default, why did SBA continue to maintain that plaintiffs' dilemma was a result of their own poor business judgment rather than an inequity in the pricing mechanism that governed the procurement? If firms that *must compete* for fuel delivery contracts could not make money at the FMP, how could socially and economically disadvantaged firms be expected to make money at those prices? [14] Some price exception allowing an upward adjustment to the FMP had to be included in the 1979 Agreement so as not to thwart the purposes of section 8(a).

**13.** The way the section 8(a) program is structured, a participating firm must continually meet various standards of performance in order to remain in good standing with the SBA. Naturally, a default on a subcontract with the SBA does not help the section 8(a) firm's standing, and may actually be cause for termination from the program, and all of its benefits, most notably, its loan guaranties. This is the main reason the section 8(a) firms, such as plaintiffs at bar, were not able to default like their non-section 8(a) counterparts: the economic penalties would have been devastating, and not a simple

matter of the SBA recovering the excess costs of reprocurement. Def. Supp. Resp. at 13.

**14.** Defendants would have the Court focus on the fact that many of the FMP-setters are small businesses just like plaintiffs, and that plaintiffs themselves have successfully won and performed subcontracts under *competitive* solicitations. Def. Supp. Resp. at 7–8. These facts are irrelevant to this case which comes under a noncompetitive solicitation and which concerns not just small businesses, but socially and economically disadvantaged small businesses.

### C. SBA's Evaluation of Costs, Prices and Profits

Plaintiffs relied on the SBA and its Administrator to know the fuel market and to be sure that "final negotiated [line] item prices [we]re based on fair and reasonable costs and profit." Interagency Agreement, Pt. II, § D. SBA had responsibilities under the 1979 Agreement, and plaintiffs were injured when those responsibilities were not met.[15]

The burden was placed on the shoulders of the section 8(a) firms to exercise their good business judgment. The SBA maintains that the section 8(a) plaintiffs "were free to decline a contract award if they determined that the FMP was inadequate to allow them to obtain a satisfactory margin." Def. Supp. Resp. at 8. And yet, the Act itself contemplates offering these firms business and management expertise. 15 U.S.C. § 637(b)(1)(A).

The section 8(a) plaintiffs had good reason to depend on the SBA to enter into a prime contract with the government procuring agency (DLA) which would allow for reasonable profits to be had on *each* subcontract, *and* which guarded against the downside [16] of non-section 8(a) firms being able to set the FMPs as detailed above. The duties of SBA outlined in the 1979 Agreement itself, and the regulations and standard operating procedures cited above, all lead the Court to clearly see plaintiffs' good reasons for dependence on the SBA.

The key to understanding this case is the 1979 Agreement between the SBA and DLA whereby a price for fuel oil to be supplied was set. The price was attractively portrayed in the 1979 Agreement as the "highest award price" for the competitively solicited line item. In reality, it was the *low bid price* that was utilized in these section 8(a) contracts. Since these small business firms had to purchase their fuel supplies from the larger oil companies and then resell to the government (DLA) at the lowest bid price, they could not survive economically. This arrangement was not only contrary to the purpose of the Small Business Act, it became the high road to economic ruin for these plaintiffs.

### D. Negotiation of Terms and Conditions

Finally, 15 U.S.C. § 637(a)(3)(A) provides: "Any Program Participant selected by the Administration to perform a contract to be let noncompetitively pursuant to this subsection shall, when practicable, participate in any negotiation of the terms and conditions of such contract." Plaintiffs complain that they were not involved in

15. There has been much discussion in the parties' briefs about the word "assure" in the 1979 Agreement, and its synonym "guarantee." It is defendants' position that the 1979 Agreement does not "guarantee" plaintiffs a profit. The Court is inclined to agree, but only insofar as that term includes the notion of paying plaintiffs for any economic shortfall as a result of the fluctuations in the supply or demand of fuel products. The Court is mindful that a futures market in Chicago concerns itself with that problem.

However, an "assurance" that final prices are based on fair and reasonable costs and profit simply means that the SBA has done its job of determining that each section 8(a) contractor will be able to perform each particular subcontract they enter into, *and* that each subcontractor will earn a reasonable profit on each subcontract.

In short, the SBA does not have to predict with certainty the future prices and costs of fuel, but the SBA must incorporate its market expertise while utilizing flexibility when fashioning prices with the procuring agency, and when negotiating with the section 8(a) firms. It was a *per se* violation of this responsibility when the SBA relied on a formula of competitive bidding as embodied in the 1979 Agreement, rather than its own independent analysis of each section 8(a) firm's costs, prices and profits.

The Court is careful not to confuse the authority of the SBA and the DFSC under the 1979 Agreement to change parts of an FMP (*e.g.* delivery by tankwagon rather than by transport) after doing a price analysis, and the inflexible prohibition in the 1979 Agreement applied to plaintiffs against raising an FMP because of the unrealistically low bid of a defaulting non-section 8(a) FMP-setter.

16. An obvious downside of the fuel delivery business is a fluctuation in the price of fuel products. By its decision today, the Court in no way seeks to change the present responsibilities of the SBA, the federal procuring agencies or the section 8(a) firms with respect to futures trading or hedging against the fluctuations in fuel prices on account of its supply or demand.

either the negotiation of the 1979 Agreement, or their subcontracts with the SBA. Defendants argue that such negotiations were "not practicable."

The language of the statute quoted above could not be more clear. The defense of impracticability is narrow indeed. The word "practicable" means "capable of being ... done." Oxford English Dictionary, 2d ed., vol. XII, 1989.[17] There is nothing in the record to suggest that negotiations in either case were simply not feasible. The statute does not mention convenience or cost to the negotiating parties, if in fact negotiations were considered to be too expensive or inconvenient by the defendants. Defendants have not met their burden of showing impracticability of negotiating with the plaintiffs.

If the statute is not clear enough, the Standard Operating Procedure adopted by SBA is the *coup de grace:*

f. Conduct of Negotiations

The purpose of the negotiations, insofar as the 8(a) concern and SBA are concerned, is to negotiate the terms and conditions of the proposed subcontract and agree upon a price which will permit the 8(a) concern to perform and earn a reasonable profit. It may be assumed that the representatives of the contracting officer of the procuring agency will seek to limit the contract price to the amount they consider to be the "Fair Market Price" or less. If the price proposed by the procuring agency is not considered sufficient to assure a reasonable profit for 8(a) [sic] concern, the SBA contract negotiator, with the advice and assistance of such price analysis personnel as may be available, will conduct further negotiations for the purpose of obtaining agreement to a higher and more appropriate price.

S.O.P. 80.05, Chapter 8, ¶ 68 (effective September 4, 1979).

The Court holds that plaintiffs had a right to participate in both the negotiation of the 1979 Agreement since it outlined the "terms and conditions" of plaintiffs' subcontracts, and the negotiations of their own subcontracts.

## III. RELIEF

The relief sought is: 1) a declaratory judgment that the conduct of defendants in negotiating and implementing the Interagency Agreement was not in accordance with the law; 2) a declaratory judgment that the Administrator and the Associate Administrator of the SBA exceeded their authority in negotiating and implementing the Interagency Agreement; 3) money damages in an amount not to exceed $15,-000,000; and 4) attorneys fees and other expenses incurred under the Equal Access to Justice Act, 28 U.S.C. § 2412.

The Court grants plaintiffs' prayer for a declaratory judgment, and awards a sum certain in money damages. The amount of those damages will be determined after briefing and a hearing on that issue. The Court will determine any award of attorney's fees and costs upon a proper petition by plaintiffs, any opposition thereto, and a hearing.

### *Conclusion*

By negotiating and implementing the Interagency Agreement with its formulaic and inflexible pricing scheme, the SBA and its Administrator thwarted the purpose of section 8(a) of the Small Business Act, and denied plaintiffs the benefit of same. By failing to include plaintiffs in negotiating the Interagency Agreement and their subcontracts, defendants violated 15 U.S.C. § 637(a)(3)(A). In addition, the SBA and its Administrator relied on the formula of competition embodied in the Interagency Agreement to yield fair and reasonable prices with fair and reasonable profits for plaintiffs without performing an adequate independent analysis.

 As a result of the actions of the SBA and its Administrator, each was unjustly enriched. This unjust enrichment

---

**17.** The full first definition is: "capable of being put into practice, carried out in action, effected, accomplished or done; feasible." *Id.*

amounts to a taking of private property without just compensation in violation of the fifth amendment to the Constitution of the United States. Therefore, having survived all of the jurisdictional and procedural challenges above, plaintiffs are entitled to judgment as a matter of law.

APPENDIX

*MEMORANDUM OF AGREEMENT DOMESTIC POST, CAMP AND STATION GROUND FUEL SECTION 8(a) CONTRACTING PROCEDURE*

I. *IDENTIFICATION AND RESERVATION OF LINE ITEMS FOR THE 8(a) PROGRAM*

A. SBA will request items for reservation at least nine months prior to the ordering period and DFSC will approve or disapprove the reservation within 30 days thereafter.

B. DFSC will not be required to reserve for procurement under the 8(a) program more than 50% of the total estimated required gallonage by petroleum products and method of delivery for each DFSC Region.

C. It is understood that certain savings can be achieved by having one contractor deliver to a group of related stops. DFSC will identify those items which must be awarded as a group to a single contractor. SBA may request that certain items within the group be dropped. The determination of which items to drop will be negotiated on a case by case basis between SBA and DFSC. Where there is a failure to reach agreement, the matter will be referred to DLA for resolution.

D. SBA shall accept the defined Commercial Market Area(s) (as defined in III.A. herein). SBA may delete items previously requested for reservation 30 days prior to the opening date for the regional competitive solicitation in order that the unreserved items may be competitively solicited. After SBA has had an opportunity to delete the items, DFSC will finalize the reservation of the items by letter to SBA. There will be no further changes to the Commercial Market Area(s) after reservation of the items has been finalized.

E. DFSC will request pre-award surveys be performed by the Defense Contract Administration Service as deemed appropriate. The resulting report from the pre-award survey will be sent to the SBA.

II. *MANNER OF SOLICITATION*

A. DFSC will issue one copy of the solicitation to SBA and three copies to the prospective 8(a) Contractor approximately five months prior to the ordering period.

B. The prospective 8(a) Contractor will submit the original and one copy of its proposal, with individual prices for each item to SBA. Final date of this submission will be established by SBA and the prospective 8(a) Contractor, but shall be early enough to allow time for the SBA to request DCAA audit and negotiate prices with the 8(a) Contractor. SBA will submit, with any exceptions to the terms and conditions of the solicitations, the original and one copy of the prospective 8(a) Contractor's offer to DFSC by the solicitation closing date. The offer will include all certification and documentation except the individual offer price(s).

C. The SBA will forward the final negotiated individual offer prices to DFSC after SBA receives the Fair Market Price, and completes negotiations with the 8(a) Contractors.

D. It will be the responsibility of SBA to assure that the final negotiated item prices are based on fair and reasonable costs and profit.

III. *DEVELOPMENT OF "FAIR MARKET PRICES" FOR PROSPECTIVE 8(a) CONTRACTS (DAR 1–705.5(b)(2)*

A. The Commercial Market Area(s) will be defined by DFSC, but be subject to further negotiations with SBA. The "Commercial Market Area" will be a commercial delivery area serviced by existing commercial sources of supply. It is anticipated that these sources would supply the product if there were

■

no 8(a) contractors. The Commercial Market Area will apply to the destination where the 8(a) Contractor delivers product to the Government. Each DFSC Region will, in all likelihood, include several Commercial Market Areas and the items which SBA requests for a reservation may fall into several Commercial Market Areas. Commercial Market Areas will not overlap one another.

B. The Fair Market Price (FMP) is the highest award price for the competitively solicited items (by type of product and method of delivery) within each Commercial Market Area of the region. However, unusual items will not be considered in establishing the FMP.

C. If no competitively solicited bids are received for a given product in the Commercial Market Area, DFSC will use an alternative method for establishing the FMP as stated in Defense Acquisition Regulations 1–705.-5(c)(1)(L). Examples are as follows:

(1) Computing a price by the following formula based on the applicability of each element:

(+) Highest anticipated award price for a similar product to be awarded within the Commercial Market Area.

(−) Freight Rate from supplier to the using activity for the competitive bid.

(+) Freight Rate from 8(a) Contractor's supply point to the using activity.

(+) Product Differential (Example: 2% Sulphur

(−) vs 3%).

(+) Inspection Fee, if not included in competitive price.

(=) Fair Market Price (FMP)

(2) Using the following as similar products in regard to price:

(a) Product Codes 34 (# 2 diesel) and 46 (# 2 Fuel Oil).

(b) Product Codes 32 (# 1 diesel); 40 (kerosene); and 43 (# 1 Fuel Oil).

(3) Using an average price differential between different delivery methods to the same location or between different delivery methods for the same or similar product, based on the competitively received regional solicitation bids.

D. In accordance with Defense Acquisition Regulation 1–705.5(b)(2) DFSC will furnish SBA, upon request, the price analysis (excluding privileged information), used to determine the Fair Market Price. In cases where it appears that there are mistakes in the price analysis or the analysis is based on assumptions which are not valid, SBA may request that the determination of the FMP be reviewed and changed.

IV. *SELECTION OF THE CONTRACT PRICES*

A. DFSC will accept prices from SBA up to the FMP as being fair and reasonable. SBA shall notify DFSC of these finally negotiated prices within 30 days after receipt of the FMPs. Upon receipt DFSC will prepare the prime and subcontract documents for contract award.

B. SBA's negotiations with the 8(a) firm may result in submission of an item price for contract award which is lower than the FMP.

C. SBA will not submit to DFSC prices which exceed the FMP. Items that SBA determines are unacceptable for contract award or for which prices exceed the FMP will be released from reservation and returned to DFSC within 30 days after SBA's receipt of the FMP.

V. *DEVIATION FROM THIS PROCEDURE*

Any modification or deviations from the foregoing procedure may be approved only by mutual agreement between the Defense Logistics Agency, Staff Director for Small and Disadvantaged Business Utilization, or his designee, and the Associate Administrator for Minority Small Business and Capital Ownership Devel-

opment of the U.S. Small Business Administration, or his designee.

/s/ December 5, 1979
DATE

/s/ William A. Clement
William A. Clement
Associate Administrator for
Minority
Small Business and Capital
Ownership Development, U.S. Small
Business Administration

/s/ NOV 28 1979
DATE

/s/ Charles T. Patterson
Charles T. Patterson
Staff Director, Small and
Disadvantaged Business Utilization,
Defense Logistics Agency

ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendants' opposition thereto, defendants' motion to dismiss or, in the alternative, for summary judgment, plaintiffs' opposition thereto, plaintiffs' and defendants' answers to interrogatories propounded by the Court, the oral arguments of counsel in open court and the entire record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 1st day of Aug., 1992,

ORDERED that defendants' motion to dismiss with respect to Counts I, II, III and IV of the complaint, be, and hereby is, granted with prejudice; and it is further

ORDERED that defendants' motion to dismiss or, in the alternative, for summary judgment with respect to Counts V an VI of the complaint be, and hereby is, denied; and it is further

ORDERED that plaintiffs' motion for summary judgment with respect to Counts V and VI of the complaint be, and hereby is, granted; and it is further

ORDERED, ADJUDGED AND DECLARED that the actions of the Small Business Administration, and its Administrator in entering into and implementing a certain pricing scheme as represented by an agreement between the Small Business Administration and the Defense Logistics Agency entitled *Memorandum of Agreement—Domestic Post, Camp and Station Ground Fuel Section 8(a) Contracting Procedure*, signed December 5, 1979, were beyond the scope of her authority, illegal, and are hereby rendered null and void for the reasons stated in the accompanying memorandum; and it is further

ORDERED, ADJUDGED AND DECLARED that the Small Business Administration, and its Administrator have been unjustly enriched by these aforesaid actions; and it is further

ORDERED, ADJUDGED AND DECLARED that plaintiffs were substantially injured as a result of their justifiable reliance on the Small Business Administration, and its Administrator to their detriment; and it is further

ORDERED, ADJUDGED AND DECLARED that the aforesaid actions of the Small Business Administration, and its Administrator amount to a taking of private property for public use without just compensation in violation of the fifth amendment to the Constitution of the United States; and it is further

ORDERED that the Small Business Administration and its Administrator pay over to plaintiffs a sum certain in money damages to be determined by the Court after briefing and a hearing on damages.